UNITED STATES v. LANCASTER et al.

(*Circuit Court, W. D. Georgia, S. D.* January 5, 1891.)

1. CONSPIRACY—WHAT CONSTITUTES.

A conspiracy is an unlawful confederacy or combination of two or more persons to do an unlawful act, or have accomplished an unlawful purpose. The offense is complete when the unlawful conspiracy, combination, or agreement is made, and a criminal act done in pursuance of the conspiracy is not necessary to justify a conviction for the crime of conspiracy itself.

2. SAME—EVIDENCE—DECLARATIONS.

Where several persons are proved to have combined together for the same illegal purpose, any act done by one of the parties in pursuance of the original concerted plan, and with reference to the common object, is, in contemplation of law, the act of the whole party, and the proof of such act will be evidence against any of the others who engaged in the same conspiracy. Declarations of a co-conspirator, made during the pendency of the illegal enterprise, is not only evidence against himself, but is evidence against his associates in the crime.

3. SAME—FEDERAL JURISDICTION.

An unlawful combination to injure, oppress, threaten, and intimidate a citizen of the United States in the free exercise of a right and privilege secured to him by the constitution and laws of the United States, and because of his having so exercised the same, is a conspiracy, indictable and punishable under section 5508 of the Revised Statutes. Where a citizen of the United States is interested in a decree of a circuit court of the United States, and where it has become necessary for him to sue out attachments for contempt to enforce respect for said decree, and obedience to the same, and to punish violations thereof, a conspiracy to injure, oppress, threaten, and intimidate him because of the exercise of his right to apply for such relief is a violation of the statute.

4. HOMICIDE—JURISDICTION.

If, in pursuance of the conspiracy above defined, the conspirators murder the agent of the party against whom the conspiracy is directed, they are indictable and punishable under section 5509 of the Revised Statutes, as such crime is punished by the laws of the state in which the murder was committed.

5. CONSPIRACY—SUFFICIENCY OF EVIDENCE.

The evidence necessary to support the charge of conspiracy discussed.

6. SAME.

If it appear that a particular motive for the conspiracy is alleged in the indictment, and the jury is justified from the evidence in finding that such motive did really exist, it will not matter if the conspirators had different motives additional to that the indictment describes.

7. TRIAL—INSTRUCTIONS.

It is the duty of the trial judge in a court of the United States to sum up the evidence for the assistance of the jury. This is not done to interfere with the province of the jury, for, notwithstanding the summary of the judge, they are obliged to find the facts for themselves.

8. IMPEACHMENT OF WITNESS.

Where a witness is sought to be impeached by proof of contradictory statements in matters material to the issue, it must appear that the contradictory matter is material. The witness so attacked may be sustained by proof of general good character, and at last his credit is a question for the jury.

9. EVIDENCE OF CO-CONSPIRATORS—CORROBORATION.

Where three persons who are jointly charged with the conspiracy make disclosures with reference thereto,—one makes a voluntary confession, another is permitted to become a witness for the government, under an implied promise of pardon, and testifies, and the other makes a declaration during the pendency of the criminal enterprise,—and there could have been no collusion or knowledge *inter sese* with

reference to the several statements, the fact that the three statements are, in all material respects, identical, is confirmatory of the testimony of the accomplice, and of the credit of a witness who testifies to the declaration.

10. SAME.

The confirmatory evidence need not extend to the whole testimony: but, it being shown that the accomplice has testified truly in some particulars, the jury may infer that he has in others.

11. SAME.

It is a settled rule of evidence that an accomplice, notwithstanding the turpitude of his conduct, is not on that account an incompetent witness, but the jury may, if they please, act upon the evidence of an accomplice. It is, as a matter of practice, the duty of the judge to advise them not to convict of felony upon such testimony alone, and without corroboration. No evidence can be legally competent and sufficient to corroborate an accomplice which does not tend to confirm the testimony of the accomplice upon a point material to the issue in the sense that it tends to prove the guilt of the defendant. *Com.* v. *Holmes*, 127 Mass. 424, decided by Chief Justice GRAY.

12. SAME.

Circumstances of corroboration in this case instanced.

13. CONSPIRACY TO MURDER—FEDERAL JURISDICTION.

It is not within the power of the United States to punish for a conspiracy to murder within the state unless the murder was in violation of a United States statute. In this case the question of the power of the United States to inquire into and punish for the alleged murder of Forsyth depends upon whether the killing was done in pursuance of the conspiracy alleged in the indictment.

14. SAME—EVIDENCE REQUIRED.

It requires more than proof of mere passive cognizance on the part of a prisoner of a crime to sustain a charge of conspiracy, but the jury must find that such prisoner did some act or made some agreement showing an intention to participate in some way in such conspiracy.

15. CRIMINAL LAW—EVIDENCE OF CHARACTER.

Effect of proof of good character discussed. *U. S.* v. *Jackson*, 29 Fed. Rep. 503, followed.

16. SAME.

Because a prisoner may not choose to put his character in issue he is not to be prejudiced in the minds of the jury thereby.

17. TRIAL—ARGUMENTS OF COUNSEL.

Reference in argument by counsel to impertinent topics commented on.

(*Syllabus by the Court.*)

At Law. Indictment for conspiracy.

*Marion Erwin* and *F. G. du Bignon*, for the prosecution.

*Bacon & Rutherford, Dessau & Bartlett, C. C. Smith,* and *H. V. Washington,* for the prisoners.

SPEER, J., (*charging jury.*) The prisoners are on trial upon an indictment in which they are charged with a conspiracy to injure, oppress, threaten, and intimidate a citizen of the United States of America in the free exercise and enjoyment of a right secured to him by the constitution and laws of the United States. They are further charged with a conspiracy to injure, oppress, threaten, and intimidate the citizen because of his having exercised such right and privilege so secured. The laws of the United States (Rev. St. § 5508) provide that—

"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the constitution or laws of the United States, or because of his having so exercised the same, they shall be fined not more than five thousand dollars, and imprisoned not more than ten years, and shall, moreover, be thereafter [ineligible] to any office or place of honor, profit, or trust created by the constitution or laws of the United States."

This section defines the conspiracy with which the defendants are charged. The laws of the United States (Id. § 5509) further provide—

"If in the act of violating any provision in either of the two preceding sections any other felony or misdemeanor be committed, the offender shall be punished for the same with such punishment as is attached to such felony or misdemeanor by the laws of the state in which the offense is committed."

The person against whose rights and privileges, their exercise and enjoyment, the conspiracy is charged to have been directed is Norman W. Dodge, a citizen of the United States and of the state of New York. The rights and privileges, because of which it is alleged that the conspiracy was formed "to injure, oppress, threaten, and intimidate" Norman W. Dodge, were the right to sue out certain contempt proceedings against the parties whose names are mentioned in the indictment as having violated a certain decree of this court, granted and made upon a bill in equity filed, presented, and sued to final judgment by George E. Dodge, which decree had become a muniment of the title of Norman W. Dodge to large bodies of land situated in several counties in this district. As we have seen, from the indictment, the conspiracy was to injure, oppress, threaten, and intimidate the citizen in the exercise and enjoyment of his right, secured by the constitution and laws of the United States, or, in other words, because he continued to exercise that right. It also charges that the conspiracy was formed to injure the citizen because of his having so exercised his right so secured; in other words, because he had in the past exercised the right so secured. You will observe, therefore, gentlemen, that the indictment presents the twofold accusation,—a conspiracy to injure because of a present exercise and of a past exercise of a right secured by the constitution and laws of our general government. It is further charged in the indictment that, in pursuance of the conspiracy, a description of which you have just heard, the prisoners committed a felony, to-wit, the crime of murder of John C. Forsyth, the agent of Norman W. Dodge; and, under the provision of the statute which I have read, it is in the legal contemplation of the indictment that if the prisoners, or two of them, are convicted of this conspiracy, and the murder in pursuance thereof, they shall be punished by the law of the state of Georgia relative to the crime of murder. I will now ask your attention to a somewhat closer analysis of the legal import of this statute, and the indictment which charges the prisoners with its violation. "If two or more persons conspire,"—that is, if two or more persons enter into a conspiracy. Now, what is a conspiracy? It is an unlawful confederacy or combination of two or more persons to do an unlawful act, or to accomplish an unlawful purpose. The offense is complete when the unlawful confederacy, combination, or agreement is made, and a criminal act, done in pursuance of the conspiracy, is not necessary to justify a conviction for the crime of conspiracy itself, but is merely an aggravation of it. The degree of aggravation of a conspiracy by a criminal act committed in pursuance thereof is of course proportioned to the degree of heinousness of the crime so committed. Now, to apply this definition to the charge in this indictment, if you shall find

that two or more of the prisoners entered into an unlawful confederacy or combination to do an unlawful act, or to accomplish an unlawful purpose, and if you should further find that such act or purpose is declared unlawful by the statute under which this indictment is framed, you would be justified in finding that the offense of conspiracy, as charged in the indictment, is complete, notwithstanding you may fail to find that any crime was committed in pursuance of the conspiracy. Such an unlawful agreement for such unlawful purpose would be a crime for which the punishment for conspiracy would attach, notwithstanding that the proof might be silent or insufficient as to an overt criminal act; but if, in addition to the unlawful agreement amounting to a conspiracy, you should also find that two or more of the prisoners had committed an additional crime, to-wit, the crime of murder, as charged in the indictment, and had committed it in pursuance of the conspiracy, such an additional crime would be an aggravation of the conspiracy, and would be, under the federal statute (5509) which I have quoted to you, punishable, on conviction, as such offenses are punished by the laws of the state of Georgia.

What, then, will be your first inquiry? Obviously, was there an unlawful confederacy or combination of two or more persons, or, in other words, was there a conspiracy to accomplish an illegal purpose? If so, the act of one of the conspirators is the act of all. Where several persons are proved to have combined together for the same illegal purpose, any act done by one of the parties, in pursuance of the original concerted plan, and with reference to the common object, is, in the contemplation of law, the act of the whole party, and therefore the proof of such act will be evidence against any of the others who were engaged in the same conspiracy. It is also true that any declarations made by one of the parties during the pendency of the illegal enterprise is not only evidence against himself, but is evidence against the rest of the parties, who, as we have seen, when the combination is proven, are as much responsible as if they had done the act themselves. You will observe, gentlemen, that the act of combination to do wrong is the key-stone, if I may use the expression, in the crime of conspiracy. It is true that the act of unlawful combination is more dangerous and disturbing to the peace of society than would be the crime which is the object of the combination, when accomplished by a single individual. It has been declared that the confederacy of several persons to effect any injurious object creates such a new and additional power to cause injury as to require special criminal restraints. You can readily appreciate why this is true. A conspiracy will become powerful and effective in the accomplishment of its illegal purpose in proportion to the numbers, power, and strength of the combination to effect it. It is also true that, as it involves a number in a lawless enterprise, it is proportionately demoralizing to the well-being and law-abiding characters of the men engaged, and, as a consequence, to the community to which they belong. Such is the general idea of a conspiracy. Now what is the particular conspiracy charged in this indictment, and what is the particular unlawful re-

sult which the grand jury, after its investigation, has imputed to these prisoners? It is a conspiracy, as we have seen, to injure, oppress, threaten, and intimidate Norman W. Dodge, a citizen of the United States, in the exercise—the free exercise—of the right and privilege secured to him by the constitution and laws of the United States, and because of his having so exercised the same. An unlawful combination to accomplish one or both of these results, the court charges you, is a conspiracy indictable and punishable under this statute; and it has been so held by the supreme appellate tribunal of our country. Now, what is the right of Norman W. Dodge, on account of the free exercise of which it is alleged that this conspiracy was formed, to injure and oppress him? It appears, gentlemen, from the recitals in the indictment, and the evidence to prove them, that on the 18th day of April, 1884, George E. Dodge filed his bill in equity in this, the circuit court of the United States for the western division of the southern division of Georgia, against Briggs, Hall, and Sleeper and against any other parties, in the nature of a bill of peace to quiet the title of the plaintiffs to large bodies of land in the counties of Dodge, Telfair, Lawrens, Pulaski, and Montgomery, and to restrain defendants from unlawfully interfering with and trespassing upon the same, and to have certain fraudulent or pretended deeds of the respondent delivered up to be canceled. This bill was pressed to final adjudication on the 5th day of April, 1886. It was defended by Luther A. Hall, among others, both as a respondent and as a solicitor of this court, in its equity branch. After final hearing and trial the court granted a final decree, enjoining the defendants Hall, and all other defendants, their agents and confederates, from any character of interference with the lands in question. This decree was the final judgment in the court, and, since it does not appear that any steps were taken to have it reviewed or reversed, it was in law conclusive. Subsequently to its rendition, Norman W. Dodge, as it appears from the evidence and the deeds before you, acquired by purchase the interest of George E. Dodge in the lands which were the subject-matter of that litigation, and it is true, as it is alleged in the indictment, that this decree became and now is a muniment of title. A muniment is a record,— the evidence or writings whereby a man is enabled to defend the title to his estate. You can readily perceive how this is true of the decree in question. The court charges you that it settled irrevocably, so far as human agency could settle it, the title of George E. Dodge to the lands in question; and, since Norman W. Dodge purchased from George E. Dodge, it became as strong a defense for his title as it was for the title of his grantor, George E. Dodge. Subsequently to the purchase of these lands by Norman W. Dodge, it became necessary, in his opinion, for him to apply to this court by appropriate application, for appropriate proceedings to enforce that decree against persons whom it was alleged did not have the fear of the law in their minds, and who, although enjoined from so doing, were in a lawless manner proceeding to disregard the injunction of the court, and the rights it was intended to protect. It is in evidence before you that Norman W. Dodge, to-wit, on the 24th day

of February, 1890, presented to this court a petition for attachment against Luther A. Hall, one of the prisoners now on trial in this particular case. It was charged that Luther A. Hall had systematically violated and disregarded the injunction of the court, and had interfered with the rights of property it was designed to secure. Upon that petition a rule was issued against the prisoner Hall, and he was tried, and judgment rendered thereon. Subsequently to the date of this judgment, Norman W. Dodge, to-wit, on the 12th day of July, 1890, filed and presented another petition for attachment against Luther A. Hall, because of an alleged additional violation of the decree of this court heretofore mentioned, which violation was subsequent to the judgment as rendered on the first rule. The second petition was filed, the court took it under advisement, and it has been, since that time, a proceeding pending in this court. Thereafter, to-wit, on the ——— day of August, still another petition for attachment, because of an additional alleged violation of the before-mentioned decree, was forwarded to the presiding judge of this court, who was not then within its local jurisdiction. This petition was returned to the court without action on the first Monday in October of this year, and is likewise pending proceeding here. Now it is alleged in the indictment that Norman W. Dodge, a citizen of the United States, had the right, secured to him by the constitution and laws thereof, to apply for the rules enumerated for the purpose of enforcing obedience to the decree of a court of the United States in a matter in which he was interested; and it is further charged that the conspiracy for which the defendants are on trial was had to injure, oppress, threaten, and intimidate him because of the free exercise of his right to sue for and obtain the rule first issued, and because he was, at the time of the conspiracy, suing for the rules which were then pending. Now, gentlemen, this brings us to the announcement to you of a decision which the court has already pronounced upon a demurrer presented, argued, and considered in the outset of this trial; and the court charges you distinctly, as a matter of law, that Norman W. Dodge, being authorized by the constitution of the United States, and the laws made in pursuance thereof or dependent thereon, to apply to the court for proceedings in attachment as for contempt, to enforce obedience to a decree of the court in which he was interested, such authority conferred upon him a right secured to him by the constitution and laws of the United States, and, if the prisoners conspired to injure, oppress, threaten, or intimidate him in the free exercise or enjoyment of such right, the conspiracy would be complete, as defined by the statute, and would, on conviction, subject the perpetrators to its penalty.

We have now seen what is a conspiracy,—what is the particular conspiracy charged in the indictment; and you have been instructed that the latter conspiracy is one relative to which, as jurors of this, the circuit court of the United States, you have the power and the duty to make inquiry, and, on satisfactory proof of the truth of the charge, to find a verdict. This brings us to the inquiry, what is the nature or character of the proof necessary to support a charge of conspiracy? The

first cardinal rule of evidence to which it is my duty to call your attention upon this subject has already been referred to. It is this: After evidence showing the existence of the conspiracy is submitted to the jury, the acts of other conspirators may in all cases be given in evidence against each other, if these acts were done in pursuance of the common illegal object. It is also true that letters written and declarations made by other conspirators are admissible if they are among the things done in pursuance of the conspiracy. It is also true that declarations of the conspirators may be considered a part of the *res gestæ,*—that is, part of the things done in pursuance of the conspiracy,—although they may not be precisely concurrent with the act under trial. It is enough if they spring from it, and are made under circumstances which preclude the opportunity or idea of a fictitious device or after-thought. It is also true that, while the declarations of co-conspirators made after the enterprise has ended are not admissible against each other, yet, if they are made in pursuance of the enterprise, and tending to the accomplishment of the object for which the conspiracy was made and overt acts were performed, they are admissible. It is also true, gentlemen, that it is not necessary that the conspirators should meet together in order to constitute the unlawful combination. If they have a mutual understanding, and act through one or more individuals, as a consequence of such mutual understanding, the conspiracy may be complete, and the declarations of the co-conspirators, made while the criminal enterprise was pending, are admissible against each other. It is indeed, not necessary that all the conspirators should be acquainted even with each other. If they conspire to accomplish the illegal purpose through one common acquaintance or go-between, the conspiracy may be complete, and in that event the act of one conspirator is the act of all. You will perceive that a conspiracy is a joint offense, and you will understand that, if several persons jointly conspire to commit a crime, as each man is acting through all the others, or as all are acting equally through one, the degree of guilt is equal,—the guilt is equally distributed,—and each man is not only equally chargeable with all the guilt, but the law declares that the act of his co-conspirator is his act. He loses his individuality, and becomes identified with the crime with which, and the criminal with whom, he is associated. From the very nature of the crime of conspiracy, it is almost invariably secret in its origin. Naturally every precaution is taken when several deliberately unite to commit a crime so injurious to the public welfare. It is rarely, therefore, the case that there is an actual witness to the unlawful combination itself, or to the circumstances attending its origin. It is peculiarly, therefore, a crime where the evidence of motive and of circumstances are valuable, as indicating the animating cause of the unlawful combination and the unlawful agreement itself. It is not required, therefore, that the conspiracy or the act of conspiring need be proved by direct testimony. It is indeed competent to show the conspiracy by showing disconnected overt acts, where the proof also shows that the conspirators were thrown together, or acted through a common medium, and had a common interest in promoting the object of the conspiracy.

As I have said in another place, a common design is the essence of the charge of conspiracy, and this is made to appear when the parties steadily pursue the same object when acting separately or together, by common or different means, all leading to the same unlawful result. When they do so act with a common unlawful design, the principle on which the acts and declarations of other conspirators, and acts done at different times, are admitted in evidence against the persons prosecuted, is that by the act of conspiring together the conspirators have jointly assumed to themselves as a body the attribute of individuality, so far as regards the prosecution of the common design; thus rendering whatever is done or said by one in furtherance of that design a part of the *res gestæ*, and therefore the act of all. It is always important in a charge of conspiracy to show that the alleged conspirators were known intimately to each other, or that they had a common interest in the subject with reference to which the conspiracy was formed; that they were seen conversing together or conferring together. It would be important, also, if it should appear that their intimacy had been criminal and confidential in its character. It is rarely the case that one of the persons engaged in a conspiracy will consent to become a witness to the material fact of the crime. Whenever such person does so consent, if his testimony is in itself reasonable and credible, and if it is corroborated by other evidence as to the material features of the narration, such testimony may become of the most important and satisfactory character. Of course, in a charge of conspiracy, as in every other criminal charge, the crime must be proven as laid in the indictment; but it is only necessary to prove material allegations. Thus, if it appear that a particular motive for the conspiracy is alleged in the indictment, if it sufficiently appear from the evidence, and the jury will be justified in finding that such motives did really exist, it will not matter if the conspirators had additional motives other than that the indictment describes. It will be sufficient for the purpose of the indictment if the motive which it alleges is proven, although the conspirators may possibly or probably have additional motives. The crime of conspiracy, like any other crime, must be shown to the satisfaction of the jury, and beyond a reasonable doubt. When I say "to the satisfaction of the jury," I do not mean to imply that the jury has the right to demand from the government absolute and unerring demonstration, mathematical in its accuracy. Proof of this character is rarely attainable in human investigations, disconnected with the exact sciences. All that the law requires is that the jury shall be morally and reasonably satisfied of the guilt of the accused. If, on consideration of all the evidence of this, as of any other crime, the juror can say on his oath, "I am satisfied that the defendants did the criminal act with which they are charged, and I have no reasonable doubt about it," a conviction will be justified, and all the purposes of a legal investigation met. If, however, upon a fair consideration of all the evidence, the juror is not satisfied of the truth of the charge, and doubts it upon grounds for which he can give a good reason, depending on the evidence, or the want of evidence, the prisoner is entitled to the benefit of that

doubt, and to his acquittal. It is also true, in cases of conspiracy, as in other criminal cases, that the prisoner is presumed to be innocent until the contrary is shown by proof; and, where that proof is, in whole or in part, circumstantial in its character, the circumstances relied upon by the prosecution must so distinctly indicate the guilt of the accused as to leave no reasonable explanation of them which is consistent with the prisoner's innocence. All I have said upon the subject of the degree of satisfaction necessary in a criminal trial, upon reasonable doubt, the presumption of innocence, and explanations of circumstantial evidence consistent with innocence, is as applicable to the crime of murder charged in the indictment as an overt act committed in pursuance of the conspiracy, as to the conspiracy itself. I trust, gentlemen, that you will be enabled to bear in mind all of these general doctrines of the law of conspiracy, and these rules of evidence governing its proof. They will be of great service to you when you come to examine the evidence with reference to the law. It is not to be disputed that the topics are somewhat unusual to the average criminal trial, but courts and juries must rise to the exigency of the responsibilities upon them, and you must, in the discharge of your duty, endeavor to bear in mind, as far as may be possible, the rules which the court has mentioned, and which it anxiously trusts will serve you to ascertain the truth.

Having considered the character of proof usual in cases of conspiracy, we will now advance to the consideration of the proof offered in this particular case. At this point the court will remind you that it is the duty of a judge in a court of the United States to sum up the evidence for the assistance of the jury. This is not done, as it is sometimes said, to usurp by the court the province and prerogatives of the jury; for there is nothing which the court can say which relieves the jury of the duty of finding the facts for themselves. Now, gentlemen, with the purpose to aid you in the ascertainment of truth, but in no sense to control you, the court will call your attention to what appears to be the more salient and important portions of the testimony which has been submitted to you. It is in proof that on the night of the 7th of October of last year, (1890,) Capt. John C. Forsyth was sitting with his family (his wife and children) at the supper table in his home at Normandale, in this district. I allude to the testimony of his daughter, Miss Nellie Forsyth, a young lady apparently some 16 or 17 years of age, who appeared as a witness. Capt. Forsyth, after finishing his evening meal, rose from his table, and, remarking to his wife that he must go to Macon the next day to attend court, left the supper room, and went into his sitting-room, leaving his family at the table. In a few moments, Miss Nellie testified, they heard the noise, by which the court understood her to mean the report of the gun. She heard her father faintly call, "Tell mamma to come," and she and her mother ran to him. When she saw him, he was sitting in his chair, with his eyes closed, and she first thought that he was asleep; but in an instant she saw the blood on the side of his face, and then the wound in the back of his head. Her mother brought water, and tried to staunch the bleeding, but, after a few uncertain movements

of his hand, the dying man fell forward from his chair, and, living in a state of utter unconsciousness for two or three hours, breathed his last. Miss Nellie testified that the room was full of smoke. Her father had been shot through the glass of the open window. Other witnesses testified in a manner to make plain to the jury the incidents of the assassination of Capt. Forsyth. It appeared from this testimony that one of the blinds to the window opening on the front veranda had not been closed. The shot had been fired through the heavy plate glass of the window by the person standing on the veranda. The gun was loaded with buckshot. Buckshot were found in the wound in the head, and some had been driven through into the mouth of the wounded man. The deadly charge from the gun struck the victim on the back of the head and on the left side, and, according to the testimony of Dr. Montgomery, the physician, had been driven through the brain. The charge seemed to have been a very large one. It appeared from the testimony of Mr. Curry and another witness that there were several tracks, all made by one man, on the soft ground of the flower-garden in front of the house. These tracks were made by a man apparently in his socks. He did not have on shoes, and the witness thought he was not entirely barefooted. On the next morning a party took up the trail and followed it for several miles. It had been raining the evening before, and, according to the testimony of Charley Gibbs, they followed it without difficulty. The witness joined the party about a quarter of a mile from Forsyth's house, and followed it for five miles on the tram-road. At first there was but one track, but a short distance further on, another track came in from the direction of an old shanty on the left-hand side. This track had a shoe on, and, having joined the track which had been trailed from Capt. Forsyth's, the tracks were traced together a short distance, where it was evident, from the sign, that the party who came in from the direction of the shanty sat down on the tram-road and pulled off his shoes. The tracks were then followed some five miles, to the neighborhood of the house of the Widow Gillis, a near neighbor to the witness Lem Burch, to whom reference will presently be made. The testimony of Charley Gibbs was not questioned or contradicted in any manner. It does not appear from the evidence that there were any indications as to the identity of the guilty parties on the day after the killing, in the knowledge of the friends of Capt. Forsyth. Some time after the killing, to-wit, on the —— day of November, 1890, as we learn from the testimony of Mr. Walter B. Hill, a member of the bar, who is the general counsel for Mr. Norman W. Dodge, a Mr. J. L. Bohanon came to him in Macon, and made certain important disclosures which gave the clue upon which the investigations were made which led up to the arrest of the defendants, the indictment by the grand jury, and the trial in which we are now engaged. Bohanon himself was introduced as a witness, and testified that he was down in Telfair county at the time of the death of Capt. Forsyth. He was engaged in the saw-mill business with Wright Lancaster, one of the prisoners. His home was in Pulaski county, and he had a mill near Hawkinsville; but, getting out of timber, and looking

for a location of the mill, finding that Lancaster wanted a partner, the witness sold his mill near Hawkinsville, and went into business with Lancaster. This was about the last of July. Lancaster informed the witness that he had about 20 lots of timber, and could control a great deal more. The witness testified that after the partnership was formed, and after Lancaster got cut, he told Bohanan to take his mules and get his brother's wagon, (Lancaster's brother,) and move one of the defendants, Moore, on certain lands which Lancaster stated he had bought from a Mr. Bullard. He moved Moore to the Bullard land, or rather Moore moved himself. The witness testified also as to a transaction between himself and Burch relative to the lease of certain lots of land from Burch. Burch asked him $600 a lot, and wanted cash. John Lancaster, another prisoner, told witness to let Wright make the trade. He knew all about it, and could make it much cheaper. Wright told him where Burch got the lands from, and how. Wright made the trade, and brought the lease and put it in witness' trunk, and it stayed there. Wright stated that he knew how Burch got his land,—how he got all of the lots; that he could do more with him, and could make a better trade than the witness. After witness got the lease, Burch saw him, and asked him if it was all right. Witness told him it was. Afterwards witness told him that he understood the Dodge Company was going to put him in jail for leasing that land. Burch said they would never live to put him in jail; that he had a rifle, and had been practicing with it, and that he would die at the breech of his gun before he would go to jail. It appears otherwise from the evidence that one of the lots which Burch leased to Bohanon and Lancaster had been conveyed to Burch by Wright Lancaster in a deed in evidence dated in 1888. It was one of the lots belonging to Norman W. Dodge, and was embraced in the decree perpetually enjoining Briggs, Hall, and Sleeper, their co-defendants' agents and confederates, from any interference therewith. It is also in evidence that a copy of that decree had been read at Burch's house by Tom Curry, one of the agents of the Dodge Company. The Bullard lands, on which Moore was moved, were also, in whole or in part, embraced in that decree, and were the property of Norman W. Dodge. The witness testified that he went over and lived a short time with Moore on the Bullard lands. On the morning of the 8th of October the witness testified that he was in the commissary at the mill, and he heard somebody out of doors say that Capt. Forsyth was dead. While he was there he states that Wright Lancaster came and put his hands on both sides of the door, and looked in, and said that Capt. Forsyth was dead, and stayed there about a minute. The witness was struck by the expression on his face; thought of it afterwards, and stated that he never would forget it. That day or the next Lem Burch came there, and was very much excited, talking about Capt. Forsyth's death, and asked the witness if he was not scared. The witness told him that he was not, and Burch said, "You had better be." Burch stated to witness:

"'There is a suspicion resting right here.' * * * I said: 'What do you mean by this?' He said: 'Right around this mill;' and he said: 'The Dodge

Company has offered ten thousand dollars reward [I now quote from the stenographic report of the testimony] for the murderer of Capt. Forsyth, and they have got ten of Pinkerton's men here.' I said: ' Where? ' And he said: ' Right around this mill;' and I says, ' Why,' I says, ' I would like to see some of them,' I says. ' As far as that is concerned, Wright Lancaster—I just judged from the way he talked'—I says, ' Wright Lancaster slept in the room with me last night. I know he has nothing to do with it.' He says: ' Well, Wright Lancaster went from Milan to Chauncey with Hall the day he made that speech,' and he says, ' Wright ought never to have done that; that is where he played the mischief,—ruined everything.' Burch was so much excited I suspected him myself as being the murderer of Capt. Forsyth, and I so stated to, I think, Mr. Moore. He told me that if Burch went on in this way people would think it was him. *Question.* You so stated to Mr. Moore? *Answer.* Yes, sir; and I might have to others. *Mr. Erwin.* *Q.* You went to see Mr. Honson in reference to those lots I speak of, Mr. Bohanon,—in reference to these Bullard lots. Now did you make any visit to Mr. Honson with Mr. Moore, and, if so, state what that was,—the object of the visit. *A.* I thought the trouble was between Honson and Lancaster and myself. I told Wright that I would go up and buy Honson out, mill and all, and get rid of him; then we could go ahead with the timbers. *Q.* Timbers on these lots that you refer to ? *A.* Yes, sir. Honson claimed that he had bought them from Bullard, and I thought all I had to do was to buy Honson out; and my son wanted to put up a shingle-mill, and Mr. Moore and myself went up there to see Mr. Honson, if I could make a trade with him. I couldn't make a trade with him. He asked me too much for his mill, and besides he said they were trying to bulldoze him, and I thought he insinuated that I was trying to bulldoze him, and I told him I was not. I merely wanted to buy out his mill, to settle the difficulty between him and Wright Lancaster. *Q.* Did you and Moore start back from that visit? *A.* We came back together. *Q.* State how the conversation, if any, occurred between you and Moore on that visit. *A.* Coming on back, sir. I felt embarrassed against the Dodge Company somewhat. I thought they were trying to run over those people down there, and, from what I heard, that I gathered— *Mr. Dessau.* I don't think that is a proper statement for him to make. *By the Court.* Never mind the motive which led him to say that; just tell what Moore said. *A.* I was talking about the killing of Renew, and Mr. Moore told me we better let the suspicion go on like it was,—let them think Renew was the man that killed Capt. Forsyth, and asked me if I knew who killed Capt. Forsyth. I told him I certainly did not; and then he told me all about it. *Q.* You say he stated all about it to you? Tell us what Moore did state to you. *A.* Mr. Moore told me that a negro by the name of Rich Lowry—he didn't give his given name— killed Capt. Forsyth. He said Charley Clemens and Lowry were the men that did it; that they had been taken care of by Mr. Burch for several days, —he didn't know how many days,—and that Burch had them and fed them there until they got a chance to kill him; and he said the dogs were on the wrong track; that these men killed him, and went over across the railroad, over into Montgomery county; and I said: ' Mr. Moore, who all knows about this?' and he mentioned Wright Lancaster, John Lancaster, Clemens, and Lowry,—they all knew about it,—and Burch; and he said: ' Burch asked me if it would do to tell you [witness] about it, and I told him I thought it would.' *Q.* I wanted to ask you whether or not they knew all about it before the killing of Capt. Forsyth? *A.* Yes, sir. *Q.* And whether or not the statements you were just about to make—what time was that made? *A.* I don't know when Burch asked him that. He said Burch asked him if it would do to tell me, and he told Burch he thought it would, and he did tell me. I asked him not to tell anybody that he told me. He didn't ask me not to tell it. I asked

Mr. Moore not to tell anybody that he told me. He came to me the next day, and told me that the dogs were right as far as Burch's; that those parties did go as far as Burch's, and the dogs were on the right track that far, and he said he was not certain but Henry Lancaster wasn't with them, but he didn't know. I think, sir, that is about the conversation that took place between Mr. Moore on that direct line. *Q.* Did Mr. Moore tell you—Who did he tell you by name,—persons who were concerned in the killing? *A.* Yes, sir; I stated that a while ago. I asked him who knew about it, and he told me the names of the parties. *Q.* Was the extent of it just simply that they knew of it? *A.* Yes; sir; they knew all about it. They had it done, was my understanding, sir. He went on to state further. I told him then: 'The way Burch is acting this thing will be found out.' He says: 'If it is, it won't implicate anybody but himself.' He says: 'These parties have not paid any money to it. Other parties have paid the money,—six hundred dollars. I asked him how much the negro got. He said he got six hundred dollars. *Q.* Do you know anything about any private consultation between any of these defendants and Mr. Burch before or after the killing of Capt. Forsyth? *A.* They had conversations every time they met, before and after. *Q.* Who had conversations? *A.* Wright and Henry, and every one of them. These men were all together there. They are all right around the mill. *Q.* Do you know anything about Mr. Wright Lancaster having gone over to Mr. Burch's house shortly after the killing of Capt. Forsyth? *A.* The same day that Burch was so excited at the mill I spoke to Wright about it myself. He went over to his house, and I heard that he was stricken with paralysis, and had sent for Wright and John to go over and see him. I don't know whether they went or not. I heard they did. The next day I asked Wright what was the matter with Burch, and he said, 'Nothing, only he is acting the fool.' *By Mr. Erwin.* I will ask you this, Mr. Bohanon: Did Mr. Moore tell you anything that the negro had stated—this Rich Lowry—about the killing? *A.* He said Rich Lowry said it was only a breakfast for him to kill Capt. Forsyth. *Q.* Did he tell you anything further in that connection about their general purpose? *A.* They were going to keep on until they stopped the Dodge business. *Q.* Can you recollect now about the language in that connection? *A.* They were going to kill them out; they were going to kill the Dodge Company out, until they went away. I went to Mr. Oberly, and took him off in a private room, and told him I knew who killed Capt. Forsyth, and I wanted to sell him my interest down there, and, if he would buy my interest down there, I would tell him the whole thing. He refused to do that; said he was not authorized to do it, and could not do it, but asked me if I would come to Macon with him. I told him I didn't have a cent in my pocket, and if he would pay my way to Macon I would come. He went on up to Mr. Hill's office, and I related the same thing to them; that I knew, and I wasn't able to lose what I had there, and if they would just buy me out, that I would put them into possession of all facts, and they could go ahead if they saw fit. They refused to do that. They said they had no authority; didn't want what I had; wouldn't hardly have it anyhow."

The witness then stated that he made the disclosures which afforded the clew to the theory of the prosecution. This concludes the direct examination of the witness Bohannon. He was also closely cross-examined, without, in the opinion of the court, inducing him to change his direct testimony in any material particular. It is true, however, that this witness had been very fiercely attacked in argument by the defendants' counsel upon two methods of attack looking to his discredit before the jury. The first of these is by attempted proof of statements

contradictory to his testimony under oath. One method of impeaching the testimony of the witness is by proof of contradictory statements in a matter material to the issue. The witness was asked if he did not, on the 18th of October, tell Tom Eason, between Helena and the Ocmulgee river, that "you didn't know of your own knowledge, or had no information, who was the murderer of Capt. Forsyth." The witness answered that he didn't know, and had no recollection, of any such statements. Eason testified for the defense that the witness did say, in substance, what the question imported. It is for the jury to say whether this is sufficient to discredit the witness. The amount of credit to be given a witness is entirely a question for the jury; but it is proper for the jury to consider all the bearings of the facts in evidence before them, and, if they find that the relations between the Lancasters and Eason were close and intimate, they will do well to consider carefully whether a mere evasion of the question, the answer to which, if Bohannon's testimony is true, would impute a terrible crime to the friend of Eason, is a circumstance upon which they can afford to discredit the testimony of the witness. Another attempted contradiction is based upon a question alleged to have been propounded to the witness by one B. H. Frizzell. The witness was asked if he did not state to Frizzell, in substance, that he knew nothing that implicated the Lancasters. This was at the fair in October in this city. The witness replied that he did not say that, but he did tell Frizzell that he had taken out no affidavit against the Lancasters, and it does not appear that any such affidavits were made. Frizzell testified substantially that Bohannon told him that he knew nothing implicating Wright Lancaster. The jury should bear in mind, also, that Frizzell was a lawyer for Lancaster, and came here, according to his own testimony, in part to sound Bohannon. The witness was also asked if he did not say to Mr. W. J. Grace, a young attorney resident in this city, that there was some money in this matter; that witness and Grace could make it, and urged him to go down there, and see if they could not work up the case as detectives. The witness stated that he did not remember any such conversation, but might have talked with Mr. Grace about it. The court charges you upon this subject, if you find that there is a contradiction between the witness and W. J. Grace, it is not a matter upon which an impeachment can be based, because it is not material to the issue. He was also asked if he did not, in a conversation with Mr. M. T. Grace, say that he was up here helping to find out who killed Forsyth. The witness did not deny it. The court does not think this a ground of impeachment. A witness who is impeached by proof of contradictory statements may be sustained by proof of general good character, and the government in this case has offered proof of the general good character for truth and veracity of J. L. Bohannon. Mr. W. W. Harrold, who lives at Eastman, in Dodge county, testified that he knew J. L. Bohannon; that his general character for truth and veracity is good; and that he would be obliged to believe him on his oath. Judge W. L. Grice, Col. George W. Jordan, Sr., Mr. Walker, and Dr. Fleetwood, Mr. Henry Waterman, and Mr. J. D. Bos-

tick testify with unanimity to the general good character for truth and
veracity of the witness. These are citizens of the community in which
he lives, and it is the province of the jury to determine what weight is
to be given to their opinions of their acquaintance or neighbor. A wit-
ness is presumed to be truthful until the contrary is made to appear,
and it is the duty of the jury to accept the testimony of a witness,
which is not in itself improbable, or which is not impeached in some of
the methods indicated by the law. But, as I have said, the credibility
of a witness is entirely for the jury. With reference to the attack made
upon this witness upon the alleged ground that he has bartered his tes-
timony in this case, the jury should bear in mind his evidence and the
evidence of Mr. Hill, which is all the evidence on that subject, except
the testimony of one of the defendants as to the value of the property he
had at the mill. It is important, too, for the jury to inquire whether it
be true that the witness felt obliged to relinquish possession of his prop-
erty there at the mill, and, if so, to determine whether he did this upon
imaginary grounds, or upon the ground he states, that he has been com-
pelled to remain in Macon for his protection. If it be true that, shortly
after the death of Forsyth, the witness suddenly left his place of
business without any business reasons, and has remained away since
that time, and if this was done before the arrest of the prisoners, and if
it further appear that he left his property behind him in the possession
of Wright Lancaster, it is a circumstance which may or may not be im-
portant, as the jury may or may not believe the motive which he as-
signs for it. If this was not his motive, why did he leave there, and
why has he not returned? The jury will also bear in mind that, accord-
ing to the testimony of Bohannon and Hill,—and that is all the testi-
mony on this subject, as I have said, except a reference to a value of the
property at the mill, taken there by Bohannon,—Bohannon declined to
accept any reward, and only asked that a fair valuation be placed upon
his property, if needful, by a disinterested party, and that Mr. Dodge
buy it at the price so fixed. This even was not promised him. Never-
theless he gave the testimony which has been read to the jury. It is
true he was assured that Dodge was a just man, with the natural infer-
ence that he would be protected from absolute loss. This is a fact for
the jury to consider, and it is for them to say to what extent it would
show an interest in Bohannon in his testimony with a view to its dis-
credit. The main inquiry—the vital question—is, do the jury believe
that Bohannon has told the truth? and, if they do, they are authorized
to accept his testimony, notwithstanding there may be circumstances
upon which it may be criticised, and notwithstanding that he may have
talked idly or recklessly in the presence of strangers. Such conversa-
tions are always to be carefully scanned by the jury, their surrounding
circumstances closely examined, before a jury will be authorized to im-
pute perjury thereon. It is proper for the court to direct the attention
of the jury to the fact that Bohannon's statement was made before any
arrest was made. It is also true that after the arrest of the prisoners one
of them made a statement which, while    went further than Bohannon's,

confirmed the disclosures which he made in nearly every important particular. I allude to the statement and subsequent testimony of Lem Burch, one of the parties indicted, who has been permitted to become, under an ancient and salutary practice, existing both in this and the mother country, by which one of a number of persons charged with crime is permitted to become a witness for the government, to supply evidence of guilt which could not otherwise be procured. It does not appear from the evidence that Burch made any confession before he was arrested, and until Bohannon had told the story, and it does not appear that Burch knew what Bohannon had told; and yet the testimony of Burch tallies in large measure with the original disclosures of Bohannon. This is also true of the confession of Clemens. In many material particulars it corroborates Bohannon, and yet, when Clemens made his confession, it does not appear that he knew anything Bohannon had stated, although it was told him that Burch had made a statement. Now the confession of Clemens is not evidence except as against himself; but if the jury, in the absence of any proof of collusion, can discover in the confession of Clemens indications which tend to show that the original statements of Bohannon are true, while the confession is not direct proof to show the guilt of the other prisoners, it may be it is proof, in that event, to sustain the credibility of Bohannon. If it be true, also, that all the subsequent developments of the investigations tend to verify and sustain the original disclosures of Bohannon, as reported to him by Moore, and as he himself observed in the transactions about the mill, this is important for the consideration of the jury.

In estimating the amount of credit to be given to the testimony of Bohannon, you are not authorized, gentlemen, to impute perjury to him unless you feel it your duty so to do. As I have said, until he is contradicted in matters material to the issue, or otherwise impeached in some manner pointed out by the law, he is presumed to tell the truth. In weighing this testimony, to ascertain its value, it is further your duty to consider all the other evidence in the case as relating to it, and whether it contradicts or supports it. Your first inquiry, of course, will be, what motive would Bohannon have to swear falsely, especially against Hall and the Lancasters, Moore, and Knight. Had he ever quarreled with the Lancasters or either of the other defendants? Were his relations cordial or otherwise with the prisoners? If you find a motive for perjury in the evidence, it should go to his discredit; but, if you fail to perceive such a motive, it would be equally strong in favor of his credit. It is urged in argument that he testified to procure a reward, but you will remember, gentlemen, on that subject, of course, as is your duty, the testimony of Mr. Hill that he stated that he would not take a reward, but only desired to be reimbursed what he felt he must lose if he gave his testimony. Even had he testified for a reward, however, that in itself would not necessarily impeach him, but would be a circumstance that the jury should properly estimate as a part of his testimony. If Bohannon really had property interest there which he felt that he would lose as a result of his disclosures, there is nothing illegal in his stipulation, or rather in

his attempt to obtain a stipulation, before giving his testimony, that he should be protected from loss. The *bona fides* and genuineness of his conduct is a question for the jury, as likewise is the amount of credit to be given him. If you find from the evidence that, as a result of Bohannon's disclosures, implicating nine men in this conspiracy, proceedings were instituted which resulted in the flight of two of them and the confessions of two others, this fact, in itself, is a circumstance which tends to corroborate the truth of his statement to the extent that it is true in part, and it would be then for the jury to say whether it is true in its entirety. If you find from the evidence that there was no collusion between Bohannon and Burch and Clemens, and that each made disclosures at different times, without conferring with each other, and without probability that they did, or could have conferred, and if you further find that their disclosures were substantially the same, while the testimony of the two accomplices could not corroborate each other, and while the confession of Clemens cannot be considered as evidence against the other prisoners, yet the unanimity of statements of the three, made without the opportunity of conference, or without proof that they did confer, is a fact which tends to corroborate the three statements so made. I mean to say that the unanimity, if it exists without a conference, if none was had between these three men, may give in the minds of the jury mutual and interchangeable support, each to the others.

Let us now, gentlemen, advance to the consideration of Burch's testimony, and determine, if you can, what is the effect it should legally and properly have in this investigation. You will remember, gentlemen, the circumstances which attended the hearing of this testimony. The witness was desperately ill, and the court, from a desire to insure a thorough and certain investigation of the serious case on trial, went with you to his bedside, and, under circumstances of painful personal inconvenience to court, jury, and counsel, heard this testimony. It was reported by the official stenographer, and is before you. You must, however, as I have said before, remember this testimony, and make your finding with reference to it for yourselves. What I say or read about it is simply to assist you as far as I can. You will have the lease from Burch to Bohannon and Lancaster out with you. You will remember that Burch testified that his titles were fraudulent; that he got them from Andrew Renew and from Luke Williams. One lot he got from Lancaster. The witness testified he had the deeds of these lots made, some to his son, another to his daughter, and another to his wife, to keep from getting into the United States court. As to lot 58, which he got from Wright Lancaster, he paid him $25 for it. He testified that Renew had no interest in the lots, the titles to which, the witness got from him. He paid Renew $75 for the title, though he knew he had no interest in the lands. He testified that Wright Lancaster told him that he had the best right to the timber. I now read to you from the stenographic report of the evidence:

"That he would give me [Burch] a start in that business, he said, and I told him I would see about it, and told him I would see Col. Hall, or some-

body. about it. He contended that he would give me one thousand dollars for it, and that was more than I could get,—than anybody else would give me. *Question.* Who was that talking, Wright Lancaster? *Answer.* Yes, sir. He would give me one thousand dollars for it. He said he didn't ask them no odds. I told him they could enjoin him and stop him, and he said they would not do it. He went on and spoke about having Forsyth killed, and said trouble had been. The land trouble down there would have been settled if Billy Clemens had not have got killed; that he would have had Billy Clemens to kill him. *Q.* Would have had Billy Clemens to kill who? *A.* Forsyth. He said that it would have been done: that they were ruining the country, and so on, and said that they knew parties they could get to do it, and he said that he knew who he could get to work at it, and they said, ' What would he do it for?' *Q.* What did they say they would do it for? *A.* He said that he could have it done for six hundred dollars. In the mean time I went up to Eastman, and saw Col. Hall about the titles. *Q.* What time was that, Mr. Burch? *A.* I think it was when he was at home on bond. *Q.* The time he was let out of jail for ten days? *A.* He said that— *By the Court.* Who said? *Witness.* Col. Hall. When I asked him about the land business, he said that ' stick out everybody; everybody stick out;' that he expected some of them would be killed. *Q.* Some of who? *A.* Of them, —the company; and then he spoke in person of Forsyth, and said he would give one hundred dollars. *Q.* One hundred dollars for what? *A.* For his being killed. He wanted to know how they were doing down there, and so on, and I told him, and then I saw Wright after that, and he said to work it up, too, and I told him I was afraid I would get into trouble; that I wanted my lease back, and he said that he would have Forsyth killed, and this here Rich Lowry and Charley Clemens come there to my place to kill him, and stayed there. *Q.* How did they come? *A.* Well, they come to the plum orchard. The first I knew of it, John Lancaster brought my buggy to me, and told me Charles Clemens wanted to see me, and I went down to the plum orchard where he was, and he was knocking along down there, and told me his business, and told me that Wright had sent him; and he knocked around there a day or two, and I seen Rich, and Rich told me that he had—and he said—told me that he would help me to feed him, and told me to kill mutton when I wanted to, and he would help me to feed him. *By the Court.* Who told you that? *A.* Wright Lancaster. *Q.* Help feed who? *A.* Rich Lowry and these boys. *By Mr. Erwin.* Told you to kill mutton whenever you wanted to? *A.* Yes, sir. *Q.* To help feed them? *A.* Yes, sir. *Q.* How long did these men, this Rich Herring, *alias* Rich Lowry, and Charley Clemens stay at your place before the killing of Forsyth actually occurred? *A.* About three weeks. *Q.* About three weeks? *A.* I think it was about three weeks. *Q.* During that time, Mr. Burch, did Wright Lancaster come to your house? *A.* He come there one time. *Q.* Did he stay all night at your house,—one night or not? *A.* If my memory serves me right, he did. *By Mr. Erwin.* Mr. Burch, do you know anything about how Lowry, or whether or not this Rich Lowry, was occupied this year at any time during these three weeks he was stopping at your place? *A.* I don't think he was."

When asked to tell the circumstances of the murder, the witness said:

"Well, I don't know of nothing that happened at all, only they just take their guns. *Q.* Who took their guns? *A.* Charley Clemens and Rich Lowry. *Q.* Did they go off for any purpose that evening? Do you know whether they stated they were going for any purpose? *A.* Well, I knowed that they were going there, of course. I weren't there, I don't think, when they left. *Q.* You were there not long before they did return? *A.* Yes, sir; the dogs woke me up. *Q.* Well, did Rich Lowry make any statement to you as to what they

had done when they come back that night? *A.* They both did. Rich Lowry said that he had killed Forsyth. *Q.* Rich Lowry told you he had killed Forsyth? *A.* Yes, sir. *Q.* What did Charley Clemens say about it? *A.* He said that he did. *Q.* Said who did? *A.* Said Rich Lowry did. Rich Lowry said himself he did. *Q.* Mr. Burch, do you know whether or not there were any inducements offered to Lowry and Clemens to induce them to kill Capt. Forsyth? *A.* Yes, sir. *Q.* What was that inducement offered to them? *A.* Six hundred dollars. *Q.* Well, who was to pay the six hundred dollars? *A.* Well, I paid two hundred dollars, or something over two hundred dollars, and Col. Hall was to pay one hundred dollars, and I let him have a pistol worth about—it cost about—sixteen·dollars, I reckon. *By the Court.* Let who have it? *A.* The negro.· *Q.* Lowry? *A.* Yes, sir. *Q.* You answered who actually paid the money. My question was whether or not there was any promise to pay them before the killing took place? If so, who made the promise? Who was to have paid the money which was paid,—the six hundred dollars? *A.* They were to pay it to me, and I was to pay it to him. *By the Court.* No matter who you paid, who paid you? *A.* Well, Col. Hall was to pay one hundred dollars and Wright Lancaster was to pay two hundred dollars, and I was to pay two hundred dollars, and no more. Louis Knight was to pay all he could. He never paid anything, that I know of. If he did, didn't know it. *By Mr. Erwin.* *Q.* Mr. Burch, commencing with Wright Lancaster, how did you know that he was to pay you two hundred dollars to pay to the man that killed Capt. Forsyth? *A.* Well, he told me that he would, and was gwine on snorting around because they hadn't killed him before they did. He said that he had money,—money that he was saving for that purpose,—and then when it was done he had no money, nor he wouldn't pay none. *Q.* Did he give you any reason for not paying the money after the murder was committed? Did you go to him for the money? *A.* Yes, sir.· *By the Court.* Mr. District Attorney, how did he know that Mr. Hall was to pay one hundred dollars, and how does he know that Mr. Knight was to pay anything. You had better show the conspiracy, if you can show it. *By Mr. Erwin.* Well, Mr. Burch, how did you know that Mr. Hall—Mr. Luther A. Hall—was to pay one hundred dollars to it? *A.* He told me he would. *Q.* Where were you when he told you that? *A.* I was in his office. *Q.* Where? *A.* Eastman. *Q.* At this same time? *A.* You mean the time when he was out on bond? Yes, sir. *Q.* Well, I will ask you, Mr. Burch, whether or not Mr. Hall at any time after that time he was out on bond, either by word of mouth or by letter, or otherwise, reminded you of what he had said at that time? *A.* Yes, sir. *Q.* How long was it? *A.* He written me two letters. *Q.* Wrote you two letters? *A.* Yes, sir. *Q.* Where were these letters from? *A.* They were from Savannah. *Q.* Was that after the ten days he was out on bond? *A.* Yes, sir. *Q.* Mr. Burch, I will ask you whether you have got these letters? *A.* I got them. *Q.* Do you know what has become of them? *A.* No, sir; they were destroyed around there I reckon. I never save no letters. *By Mr. Erwin.* I will state in my place, your honor, that I expect to prove that matter of loss of the letters, and, under the circumstances, I will ask that we proceed with the examination, and make that proof afterwards. *By the Court.* Very well, go on. *Q.* Now, Mr. Burch, I will ask you what did Mr. Hall say in these letters? *A.* He written that if matters wasn't attended to before he got back he would have it done himself. *Q.* Was there any other matter between you and him that was to be attended to other than what you have stated about the killing of Forsyth? *A.* No, sir. *Q.* That is all there was to be attended to? *A.* Yes, sir. *Q.* Did anybody read that letter that you got? *A.* My daughter did. *Q.* Your daughter, Miss Sabie Burch? *A.* Yes, sir. *Q.* Did he state anything else, do you recollect, in either of these letters about the land troubles

in general? *A.* No, sir; I don't think he did. *Q.* Anything about giving any message to other people? *A.* No, sir. *Q.* It was a short letter, then? *A.* Yes, sir. *Q.* There were two letters you say you got on the same subject? *A.* Yes, sir. *Q.* Well, now in regard to Louis Knight. You said that Wright Lancaster told you to see Louis Knight about what he would contribute towards it? *A.* Yes, sir. *Q.* You said that you did see Louis Knight at Milan. I will ask you when you saw him there? *A.* I could not tell you the date I saw him there. It was a month or more ago. I can't remember the time I saw him there. *Q.* How long before the killing of Capt. Forsyth, do you suppose? *A.* I suppose it was probably three weeks. *Q.* Did you tell Louis Knight that you wanted him to contribute to it? How was it? *A.* He just said he would do all he could. I knowed he would be able to do as much as any of them. *Q.* Did he tell you what he would do? that all he could towards— *A.* Yes, sir; of course, towards the killing of Forsyth. *Q.* Mr. Burch, I will go back again to that interview of yours with Wright Lancaster after the killing of Mr. Forsyth. You said you went to Wright Lancaster afterwards, and asked him for the money. *A.* Yes, sir. *Q.* And he would not pay anything? *A.* No, sir. *Q.* Now, did he give you any reason for not paying, or anything of that sort? *A.* Well, he said he would make that all right with Charley. He was on Charley's bond, and it would have to be paid some time, and he thought he could make that all right. *Q.* Charley who? *A.* Charley Clemens. Well, the negro had been sending me word that he would kill me if he didn't get it, and I had been down sick, and I weren't able to do anything. I didn't have no money, only as I could borrow it. I knew the negro would do it, or I thought it. I begun to beg him for the lease on the timber. I told him he could lease it. I told him I would pay it all myself rather than have that negro kill me and some of my folks, and he said that he didn't have it, and then I referred him to what he said about it, and he said he weren't going to pay; that he would make arrangements with Charley; and I says to him, I says: 'Wright, whenever you pass my place, and see my little orphan children and my grave,' I says, 'you can say you are the cause of it;' and he says: 'You are a damn liar;' and he says: 'If you say it again I will pick up a scantling and break your head.' *Q.* You mean that you told him that you would be the cause of it? *A.* That he would be the cause of it. I says: 'Whenever you pass my house, and see my little orphan children and my grave,'—that was myself who I was alluding to,— 'you can say that you are the cause of it.' And he says, 'You are a damn liar, and if you say it again I will pick up a scantling and break your head.' *Q.* Mr. Burch, did you have any sickness a day or two after Forsyth's murder? *A.* I had a stroke of paralysis on Friday. I believe it—I believe it was on Friday. *Q.* Capt. Forsyth had been killed on the Tuesday previous? *A.* I believe he had. *Q.* While you were sick was the time that Mr. Wright Lancaster came over and talked with you? *A.* No, sir; he did not. *Q.* Did he come there later? *A.* He never came there but one time, and that was in about two weeks. He come there one Sunday evening in about two weeks after I had got sick. *Q.* Now, Mr. Burch, after you had that stroke of paralysis— But before I leave that, do you recollect what time of night it was that Clemens and Lowry got back to your house when they announced that Lowry had killed Forsyth? *A.* I suppose about eleven o'clock at night. I would say probably about eleven, as near as I can guess. *Q.* Did they sleep all night in your house? *A.* No, sir. *Q.* Did they get up and leave, or how did they do? *A.* Yes, sir; they left. *Q.* Well, what happened about their leaving,—what was said? *A.* Well, I said I told them I was going down the next morning to hunt a beef, and would be on the road down there agin that old shack, and I would see them, and they told me to carry them some rations, and I carried them some rations, and they told me they would stay

there in that old shanty that day. *Q.* Well, did you see them the next morning? *A.* Yes, sir. *Q.* Did you start off with anybody when you saw them there? Was there anybody with you? *A.* Wyly was with me. *Q.* Wyly, your son? *A.* Yes, sir. *Q.* Did you see them near Turnpike creek? *A.* They were, I reckon, about—probably about—a quarter of a mile from the Turnpike creek. *Q.* Well, now, Mr. Burch, was there any money paid to them that morning? *A.* Yes, sir. *Q.* How much? *A.* Well, I am not hardly prepared to tell you exactly; it seems to me like it was that morning. No, sir; no, sir; it was that evening it was paid to them. *Q.* How much? *A.* It seems to me like it was thirty dollars. *Q.* Well, what was said about paying this, if anything,—about the full amount promised? *A.* He said that they wanted it right away. *Q.* Well, what further was said? Was anything said about paying the balance? *A.* No, sir. Well, I don't know as there was right then anything said about the trade, because I intended to see them myself. *Q.* Was there anything said that morning when you did see them yourself? *A.* No, sir; there was nothing said. I just handed them the rations, and went on. *Q.* Was there anything as to their movements that morning,—what they would do with themselves? *A.* They said that they would stay there in that old shack that day, until after they found out how everything was. As soon as they found out how everything was, they would go down to Charley's father's. *Q.* Well, Mr. Burch, I will ask you right there, before I forget it, how far does this Widow McGillis live from you? *A.* About a mile. *Q.* Did either of those men tell you about how they came back after the murder of Forsyth? What directions were given? *A.* No, sir; not that night. I have no recollection of it. *Q.* How far do you live from Normandale? *A.* We have to go there. We go straight through the woods. It is about six miles. *Q.* Where did you get the twenty or thirty dollars, that you paid to them,—the first thirty? *A.* I borrowed twenty of it from Henry Lancaster. I had the other myself. *Q.* Now, Mr. Burch, after you had taken sick, and the balance of that money was not paid, did you send any part of that money to them that was promised to them in the arrangements? *A.* I did not. I went off and borrowed. I borrowed, I believe, it was one hundred dollars. I borrowed one hundred dollars from old man Jase Lancaster, or Henry did. It was Henry Lancaster who borrowed it for me. *Q.* You didn't know this was from Jase Lancaster except what Henry told you? *A.* No, sir; but I knew he did as good as if I had seen it. *Q.* You borrowed it through Henry Lancaster? *A.* Yes, sir; from Jase Lancaster. The poor old fellow lacked a heap of knowing what it was for. *Q.* Did you make any disposition of that one hundred dollars? *A.* Before I borrowed that I went up and tried to get some money in Hawkinsville. I could not get none up there, and I got Andy Cadwell to go up there with me, so I came back to Eastman, and Andy borrowed a hundred dollars from Judge Roberts for me. *Q.* From Judge Roberts? *A.* Yes, sir. *Q.* Now, Mr. Burch, what time of day or night did you and Andrew Cadwell reach Eastman? *A.* Well, the train was, I think, two or three hours late. As soon as we got to Eastman, I think it was probably two hours before day. *Q.* Two hours before day? *A.* Yes, sir. *Q.* Where did you and Mr. Cadwell go when you got to Eastman? *A.* We went down to a blind tiger there; I reckon it was a blind tiger. *Q.* Where is this place? *A.* I could not tell you; it was down there where they got all them blind tigers. We went down there to get something to drink, and we met up with Sam Rogers, and I told them— *Q.* Met up with Sam Rogers? *A.* Yes, sir. I told him I was going off, and he could stay around there with Sam until I got back. I slipped off then, and went up to Col. Hall's to get the money. *Q.* Where did you go. Was it at Col. Hall's office or house? *A.* It was at his house. *Q.* At his house? *A.* Yes, sir. *Q.* What time was it that you went? Was that before day? *A.* Yes,

sir. *Q.* Well, now, what transpired when you went to Mr. Hall's house? *A.* I went to the door, and he asked what it was, and I told him, and he come down. *Q.* You told him, and he come down? *A.* Yes, sir. I told him who it was, and he come down. *Q.* Come down where? *A.* Into the sitting-room. *Q.* Come down into the sitting-room? *A.* Yes, sir. *Q.* Well, was it light? *A.* No, sir; it was an hour until day or more. *Q.* Well, was it dark when he came in? *A.* Yes, sir. Well, he had a lamp. *Q.* Well, was anybody in the sitting-room with you and him? *A.* No, sir. *Q.* You were by yourselves? *A.* Yes, sir. *Q.* Now, Mr. Burch, you said you got the money from him there? *A.* Yes, sir. *Q.* How much was it? *A.* One hundred dollars. *Q.* Did Mr. Hall fully understand for what that money was being given then? *A.* Certainly he did; yes, sir. *Q.* Did he talk about it? What did he say about it then? *A.* Well, Mr. Burch, you say— *Q.* Tell me what Mr. Hall said about it at that time? Did he make any statements in reference to the killing of Mr. Forsyth? If so, tell me what it was in reference to the Dodge company at that time or the Dodges. *A.* Well, he seemed to be very much displeased, and said that we ought to burn the trestles and bridges and run them out of there, and make them leave the country. *Q.* He seemed to be very much displeased or pleased? *A.* Displeased. *Q.* Because Forsyth was killed? *A.* Because it looked like he had to pay the money, and they weren't gone. He seemed to be very much displeased about having to pay the money, and there was not more done. *Q.* Very much displeased at having to pay the money and there was not more done? *A.* Yes, sir. *Q.* And they didn't do what? *A.* They didn't burn the trestles and run them out from there. *Q.* Burn the trestles and run them out? *A.* Yes, sir. *Q.* It was the morning of the circus you got the money from Mr. Hall? *A.* Yes, sir. *Q.* Now, then, you were there on the 16th or 17th of October, when the fair was there. Did you see Mr. Hall at that time in reference to the money? *A.* Yes, sir. *Q.* What conversation did you have at that time in reference to getting it? *A.* I told him— I asked him if he was ready to pay, and he said he weren't, and told me to meet him down at court on Monday or Tuesday—on Monday, and he would get it and pay it; and I went out to the river on Monday, and then I thought I would go down on Tuesday or Wednesday, when I got back, and I heard that court had adjourned. *Q.* Then you went back to Eastman on the 23d, or the day of the circus? *A.* Yes, sir. *Q.* Mr. Burch, we will leave Mr. Hall now, and go back again to Herring and Clemens. How did you send the one hundred dollars you got through Henry Lancaster from Mr.— old man Lancaster—Mr. Jase Lancaster? How did you get that money you say you paid to them? *A.* Henry carried it to them. *Q.* Henry Lancaster? *A.* Yes, sir. *Q.* How did you get the hundred dollars you got from Mr. Hall on the day of the circus,— that was the same day, I understand, that you and Andrew Cadwell borrowed one hundred dollars from Judge Roberts? *A.* Yes, sir. *Q.* How did you get that to them? *A.* Henry carried it. *Q.* As I understand you, there were two trips made by Henry to pay over that money? *A.* Yes, sir. *By the Court.* Did you tell Henry Lancaster where to go? *A.* They told him where they would meet him at. *By the Court.* Did you say they told him where they would meet him? *A.* Yes, sir. *By Mr. Erwin.* Did Henry tell you anything about it? *A.* They were to meet him on the Turnpike creek. *Q.* How did you find it out? *A.* Henry told me. *Q.* Mr. Burch, did Henry know about this—what was to be done—before it was done? *A.* I don't know whether he did or not. He came from the mill down there, and went off with Rich Lowry, and said—Henry said they went to show them the way to Normandale. *Q.* That he went to show them the way to Normandale? *A.* Yes, sir. Henry went with me, if my memory serves me right, when we made the first trip. I ain't positive; I think he did. *Q.* You didn't know for what purpose he was showing them the way?

*A.* Yes, sir. *By the Court.* What purpose? *A.* To kill Forsyth. *By Mr. Erwin.* Well, Henry was to come and report to you when he carried this money to Rich Lowry and Clemens, and came back. Did he make any report as to any conversation between them? *A.* He came back with this word, that they were going—that the negro was going—to kill me if it was not gotten up. *Q.* What was gotten up? *A.* The money. *Q.* What money? *A.* That was to be paid over by me to them for killing Forsyth."

You will observe, gentlemen, that Henry Lancaster is charged as a co-conspirator in this indictment. The proof is that he lives in Telfair county; that diligent efforts have been made to arrest him, and that he has so far escaped arrest. This is evidence which may tend to show his guilt, and may tend to corroborate Burch's story of his complicity with the crime. Burch also testified, on cross-examination, to the conversation with Bohannon, in which Bohannon told him that the Dodges would put him in jail, and he said:

"I knew that the way we were shaped up there—everything in the timber business—it would be a mighty easy matter to do it. *Question.* Easy matter to do what? *Answer.* To put us in jail.

He was also asked:

"*Q.* Did you see Louis Knight at any time after the murder of Capt. Forsyth? *A.* Yes, sir; I saw him at Milan one time. Yes, I saw him twice. I met him around opposite of Mrs. McGillis' one time hunting Sam Williams. I saw him at Milan one evening. *Q.* Well, did you talk to him about what he was to contribute to this,—about paying the amount for having murdered Forsyth? *A.* I did, that evening. *Q.* What did he say to it? *A.* Well, he was in such a fix with his eye, that it looked like he couldn't do nothing. He said he had lost his eye, and said he couldn't do anything. *Q.* Well, when Wright Lancaster and you agreed to take this part in the killing of Forsyth, what was the reason he gave why he wanted Forsyth killed? *A.* Who, Wright Lancaster? He wanted him killed, and thought it would break up the arrangement, and tear everything to pieces, and get him all the timber there was down there. *Q.* He thought if he didn't get Forsyth killed that Forsyth or his agents would be able to break up the arrangements with Bohannon and Lancaster, and wanted him killed about these lots of lands? *A.* It weren't only them. My lots weren't nothing. *Q.* To other lands? *A.* Yes, sir. *Q.* They wanted lands for the timber for their mill, was that it? *A.* Yes, sir; and they didn't have any, I don't think. *Q.* They didn't have timber for their mill, and, if they didn't kill Forsyth, he would keep them from getting it, did you say, was that it? *A.* I guess it was. *Q.* That's from the conversation he had with you. Was that what you gathered? *A.* Well, yes. I told you he said they were cutting and ruining the country. *Q.* By cutting all the timber to keep other people from getting it? *A.* By taking the lands that didn't belong to them. *Q.* This was to keep them from taking the lands, was it? *A.* Yes, sir. *Q.* Did you ever hear them say that they wanted him killed because of anything that any particular person had done? *A.* Not that I have any recollection of. *Q.* You don't recollect they ever said they wanted him killed because anybody had done anything? *A.* Not that I have any recollection of. *Q.* It was just a general idea. They wanted him killed to keep them from getting the lands they didn't believe belonged to them, is that it? *A.* Yes, sir. *Q.* Thinking about it now, as seriously as you can, that is as much of the reason as ever was given by any of them? *A.* Yes, sir. *Q.* You spoke about seeing Mr. Hall in the summer. Was it when he was at home, when let out from jail on ten days,—was that the time? *A.* Yes, sir.

*Q.* That was in Eastman, was it? *A.* Yes, sir. *Q.* You recollect who was present when you saw him? *A.* I think Elgin Young and E. F. Lee was present with me one time there. I think I saw him two or three or four times, I reckon, that evening when I was there. *Q.* There was a large number of people there when he came home, wasn't there? *A.* There was very few people there that evening. *Q.* But I forgot to ask you, though, when was it that Wright Lancaster stated this to you about the killing,—before Forsyth was killed? *A.* A great many more times than one. *Q.* Well, where? *A.* Well, pretty much everywhere I would see him. *Q.* It was a constant thing he talked about, was it? *A.* Yes, sir. He talked about it a great deal *Q.* Talked about having Forsyth killed, and it was all because Dodges would get the lands, and he could not get them for his mill? *A.* Well, he thought that he had gotten into that business, and he thought if they got him snapped up he was gone. *Q.* Into what busines? *A.* The timber business,—land and timber business. *Q.* Timber business? *A.* Yes, sir; land and timber business, where he was running his mill. *Q.* What do you mean by 'snapped up and was gone?' *A.* Taking him up and enjoining him. *Q.* When was the first time he ever said to you that he wanted you to take hold of the matter of having him killed? *A.* It was down there at his mill. He didn't say he wanted me—to have me take hold of it. He said he was going to have it done. He had two men to do it, and was going to have it done. *Q.* Well, when was the first time he ever asked you to have anything to do with it? *A.* It was along in August, I believe. It seems to me, as well as I recollect,—yes, it was behind his old commissary, where we was talking. He said that my place was an out-of-the-way place, where he could keep him concealed. *Q.* Said what was sort of an out-of-the-way place,—your house? *A.* Yes, sir. *Q.* Did he make a proposition to you that you were to take them to your house until they killed Forsyth? *A.* He said it would be best for them to go there, as they would not be seen there, and keep hid out there. *Q.* Yes, and you agreed to do it, did you? *A.* Yes, sir. *Q.* You agreed to do it at that time? *A.* No, sir; I didn't agree at that time. *Q.* At what time did you agree to do it? *A.* Well, he just sent them there, and Charley told me his business when he come, when he made the proposition that time,— that first time behind the commissary— *Q.* The time he made this proposition to you behind the commissary, how long did you and him talk together there? *A.* I suppose we stayed out there—out there on a log—I suppose we talked some fifteen minutes, probably longer. *Q.* You didn't tell him you wouldn't do it? *A.* No, sir. *Q.* When you parted, it was understood that you were going to do it? *A.* He said he was going to send them. *Q.* That was in August, you say? *A.* It seems to me that it was about the first of August. *Q.* Tell me where it was you first had a conversation with Louis Knight about this matter? *A.* At Milan. *Q.* I believe you said it was at Milan; that is where you had a talk with him? *A.* I talked with him at Milan. *Q.* Did you go— Wright referred you to him, and you told him Wright Lancaster referred you to him? *A.* Yes, sir. *Q.* And you told him you wanted him to pay for having Forsyth killed? *A.* Yes, sir. *Q.* And what was it he agreed to do? *A.* He said he would do all he could. *Q.* Did he intimate how much that would be? *A.* No, sir. *Q.* He was in favor of it, was he? *A.* I guess he was. *Q.* Now, Mr. Burch, did he say anything about whether he wanted Forsyth killed or not? *A.* Yes, sir. *Q.* And that was the time you went to him to know how much he would give? *A.* Yes, sir; that seems to me, as well as I remember, about three weeks. *Q.* Before the killing? *A.* Yes, sir. *Q.* At that time Clemens and Rich Lowry had already been to your house, hadn't they? *A.* Yes, sir; they had been there. *Q.* Been there before that? *A.* Yes, sir. *Q.* Did you see him again at any time at all after the killing,—Louis Knight? *A.* I met him and Sam

Williams not far from Mrs. McGillis'. *Q.* Mr. Burch, have you ever said to any-body since you have been in Macon that Louis Knight didn't have anything to do with this matter? *A.* No, sir; I have not. I said that— All I said about it to anybody was that I said Louis Knight would never have known anything about it, I didn't suppose, if I hadn't spoke to him about it. That is exactly what I said. *Q.* Who did you say that to? *A.* I do not know. I can't call it to mind. *Q.* Have you said it to more than one person? *A.* I don't know whether I have or not. *Q.* Do you remember having said that? *A.* No, sir; I have never said that the— *Q.* Did you say what you said just now? *A.* Yes, sir. *Q.* You did say that you didn't suppose Louis Knight would have known anything about it if you hadn't spoke to him about it? *A.* Yes, sir; that's what I said. *Q.* That's what you said, now? *A.* Yes, sir; I said I told the fellows there in jail about it. *Q.* Which fellows? *A.* I told Vaughn, I believe. *Q.* Vaughn. Who else? *A.* I think I told the at-torney general one night about it. *By Maj. Bacon.* I won't ask any-thing you said to the attorney general. I will ask you what you said to other people. *A.* I told you. *Q.* You can't remember anybody besides Vaughn? *A.* I may have said it to others. I don't remember the others I said it to, there has been so many talking to me, having so much to say, that I can't keep up with everything. *Q.* Who has been talking to you? I am not talk-ing about the district attorney. *Q.* Mr. Burch, when you went to Mr. Hall's house that night, was there any light burning in the house? *A.* I thought that I could see a light upstairs, as I went there. *A.* You mean through the windows upstairs? *A.* Well, I think—I went up, sir, it seems to me like there was a light burning up there. * * * *Q.* Could you see through the glass door —see upstairs inside—could you see through the glass door, and see Mr. Hall come down the steps? *A.* I saw him coming down the steps. *Q.* With a lamp in his hand? *A.* Yes, sir. *Q.* You could see that through the glass by the door, could you? *A.* I guess it was. I don't remember what I saw it through. *Q.* What sort of a lamp was it? *A.* I never noticed it. *Q.* Was it a lamp or a candle? *A.* I never noticed. He set it on the table. I know it wasn't a candle. *Q.* What do you call a candle? *A.* A candle is one of these white things with a wick in it. I never paid no attention to it. *Q.* Something like a tallow dip? *A.* I know what is called an old-time candle. I never see none of them; they have gone out of fashion. *Q.* You never saw a candle, and you saw that night when he came down the steps—Mr. Hall came down the steps—he had a lamp in his hand or a candle? *A.* I could not say which it was; I told you I never noticed it. I never noticed it at all. *Q.* You didn't notice down in the room whether it was a lamp or candle? *A.* I didn't stay but a few minutes. *Q.* He had the money in his pocket? *A.* No, sir; he got up and went back up there, and got the money. *Q.* What kind of money did he pay you? *A.* Paper money. *Q.* Paper money? *A.* Yes, sir. *Q.* Went upstairs? *A.* Yes, sir. *Q.* Did he leave the door open of the room you were in? *A.* Yes, sir. *Q.* You saw him go upstairs? *A.* Yes, sir. *Q.* Did he carry the lamp or candle out? *A.* I don't remem-ber. *Q.* You can't recollect whether he left you in the dark or not, can you? *A.* It seems to me that he did. I won't be positive about it. *Q.* Left you in the dark? *A.* I won't be positive about it. *Q.* You don't recollect defi-nitely whether he left you in the dark or not? *A.* No, I don't. *Q.* Was there any lamp like that hanging in the hall [referring to lamp hanging in the room in which the court was sitting] at Mrs. Hogan's boarding house? *A.* I never noticed. *Q.* You could tell whether you saw any or not, can't you? *A.* From where I was? *Q.* Yes. *A.* I think he set the light on the hall table there. He didn't have anything like that burning. *Q.* Didn't have a lamp like that burning? *A.* No, sir. Mr. Hall set with the lamp in his hand, and carried it back upstairs with him when he went back up. *Q.* And left you

in the dark? *A.* And he brought it back with him. *Q.* Left you in the dark? *A.* Yes, sir; he weren't gone over a couple of minutes, if that long. *Q.* You didn't let him know that you were coming, did you? *A.* No. *Q.* How long before that time was it that you had seen him? *A.* I seen him when that little fair was going on. *Q.* During the fair? *A.* Yes, sir. *Q.* You hadn't seen him since then? *A.* No, sir; not until that night. *Q.* When you went to his house that night? *A.* Yes, sir. *Q.* You knocked at the door? *A.* Yes, sir. *Q.* What did you knock with? *A.* Knife. *Q.* Didn't ring any bell or knock on the door,—just knocked with your knife? *A.* Yes, sir. *Q.* How many times did you knock? *A.* I didn't knock many times before he asked who it was. *Q.* Where did he ask from? *A.* Upstairs. *Q.* You hollered out your name to him? *A.* I told him that it was 'L. B.' *Q.* L. B.? *A.* Yes, sir. *Q.* He came down right away? *A.* Yes, sir. *Q.* You think that there was a light there before you knocked? *A.* It seems to me that they had a light upstairs. I won't be positive about it. It seems to me that they did. *Q.* Were you ever at his house before? *A.* I never was inside of his house before in my life. *Q.* Mr. Burch, who arrested you? *A.* Mr. Avant I think is the one. *Q.* One of these deputy-marshals? *A.* Mr. Avant I think was the one read the warrant. Yes, he is the one that arrested me,—Mr. Avant."

Gentlemen of the jury, that is the testimony both on direct and cross examination of Lem Burch; that is to say, it is, in the opinion of the court, the most material portion of the testimony. I do not mean by this to intimate that you should not recall all else that he has said, consider it, and give it due and proper weight. You must pardon me for dwelling at length on this evidence. No personal weariness of my own, and, with all the deference and respect I feel for yourselves, no consideration of your personal weariness, would justify me in withholding from you anything which, under the law, is material for your consideration in this vast and momentous issue. It is true that the evidence of Burch is the testimony of an accomplice, but it is not incompetent on that account. It may be here observed, and in this connection I use the language of Prof. Greenleaf in his well-known and valuable treatise on the law of evidence, "that it is a settled rule of evidence that a *particeps criminis*,—that is, an accomplice,—notwithstanding the turpitude of his conduct, is not, on that account, an incompetent witness." The admission of accomplices as witnesses for the government is justified by the necessity of the case; it being often impossible to bring the principal offenders to justice without them. The degree of credit which ought to be given to the testimony of an accomplice is a matter exclusively within the province of the jury. It has sometimes been said that they ought not to believe it unless his testimony is corroborated by other evidence, and, without doubt, great caution in weighing such testimony is dictated by prudence and good reason. But there is no such rule of law, it being expressly conceded that the jury may, if they please, act upon the evidence of the accomplice without any confirmation of his statement; but, on the other hand, judges, in their discretion, will advise a jury not to convict a felony upon the testimony of an accomplice alone, and without corroboration. And it is now so generally the practice to give them such advice that its omission would be regarded as an omission of duty

on the part of the judge; and, considering the respect always paid by the jury to this advice from the bench, it may be regarded as the settled course of practice not to convict a prisoner in any case of felony upon the sole and uncorroborated testimony of an accomplice.    The judges do not, in such cases, withdraw the cause from the jury by positive directions to acquit, but only advise them not to give credit to the testimony. But, though it is the settled practice in cases of felony to require other evidence in corroboration of that of an accomplice, yet, in regard to the manner and extent of the corroboration required; learned judges are not perfectly agreed. . Some have deemed it sufficient if the witness is confirmed in any material part of the case.    Others have required confirmatory evidence that the prisoner actually participated in the offense.    It is perfectly clear that it need not extend to the whole testimony; but, it being shown that the accomplice has testified truly in some particulars, the jury may infer that he has in others.    I think the true rule is that the corroborative evidence must relate to some portion of the evidence which is material to the issue, and while it need not go to the whole case; yet, in the language of a famous Massachusetts case, (*Com.* v. *Holmes,* 127 Mass. 424,) decided by Chief Justice GRAY, it is true that no evidence can be legally competent and sufficient to corroborate an accomplice which does not tend to confirm the testimony of the accomplice upon a point material to the issue, in the sense that it tends to prove the guilt of the defendant.    It is also true, gentlemen, while the court is careful to remind you that the credit of this witness is entirely for you, it would be very·far from your duty if, disregarding what may seem the natural and inherently truthful character of his testimony, you should be hurried away by fierce denunciations, by heated language, and by excited epithets imputing infamy to him.    On the contrary, with measured and impartial deliberation, like men who have a large interest at stake, you should carefully, anxiously, and judiciously scan and weigh the evidence.    If the denunciations are not justified by the circumstances of the case, they are "sound, and fury signifying nothing."    But the verdict of 12 good men is significant, it is imperishable, it is recorded on the permanent records of the court, and it will live in its effect upon the community in which it is rendered.    To demand of the jury to utterly discredit and to refuse to consider the testimony of a witness, merely because he is an accomplice, is to ask the jury to hold him incompetent as a witness on that account; while, as we have seen, the law does not make him incompetent, and, should juries do what the law does not do, many of the darkest and most dangerous crimes would go unpunished for the want of evidence of this character.    He is therefore not incompetent or disqualified as a witness, like a man who has been convicted of perjury, but he is a competent witness, and it is for the jury to determine whether, under the rule I have given· you, his testimony is sufficiently corroborated.

Now upon what facts does the government rely as corroboration of the testimony of Burch?    The first inquiry, this being a charge of conspiracy, is, who had a motive to commit it?    Upon this subject the govern-

ment calls attention to the fact that the prisoner, Hall, had been enjoined from interfering with the lands of Norman W. Dodge; that he had a large interest in the attempt to dispossess Mr. Dodge of those lands; that he said to Doughtry that he would have a man in possession of every one of the lots to which Dodge had a weak title, by Christmas; that in the letter to Stuckey he inclosed a list of some 89 of these lots, all of which he was enjoined not to interfere with, with a caution to Stuckey to go into possession, to keep the matter quiet, but to be sure not to get enough of the land to give the United States court jurisdiction; that he said to Cooper he would put him in possession of any of the lots, and defend his title for half of the land; that on the trial of the rule against him, issued for violating the injunction, he was convicted and sentenced to five months' imprisonment in the Chatham county jail: that on his way to jail he said to Avant that the Dodges had "put in to persecuting him in the United States court through Forsyth, and, if it was not stopped, he [Forsyth] would be killed." It is further in evidence that after that time two additional rules—one in July and one in August—were presented to the court; that both of them were sworn to by Forsyth, as the agent for the Dodges. These rules, or rather the applications therefor, one of which was filed, and the other not filed, because it had been sent to the judge while he was out of the jurisdiction, will be in evidence before you. It is in the testimony of Burch that Hall had said, while he was out on the 10-days leave that the court gave him to enable him to prepare for trial in the other case, that he would give $100 to have Forsyth killed. It is also in evidence that Forsyth had been a witness against Hall in the trial of the first rule on which he was convicted, and Burch testified that he received a letter to him on the subject from Hall in the jail after the return of the latter to Savannah. Miss Burch, the daughter of the accomplice, whom the jury had before them as a witness, testified that she had seen the letter, and that it was, in substance: "If you do not attend to the matter, I will have it attended to when I return home;" and Burch had testified that there was no other matter that he had to attend to for Hall save the assassination of Forsyth. It was said by one of the counsel in argument that Miss Burch was under contract to convict these prisoners. There was no such evidence, and nothing that the court recalls which will justify the inference. It is, indeed, true that, so far as the law and the protection to Burch because of his testimony is concerned, it does not make any difference whatever whether or not there is a conviction of any or all of these prisoners. The rule which permits an accomplice to become evidence for the government under promise of protection would not be tolerated for an instant among any civilized people if the construction placed upon it by the counsel could be correct. The result of the trial in which the accomplice testifies is wholly immaterial to his protection. It is also true that in a letter to Freeman, which is in evidence before you, Hall told Freeman to "tell the boys not to get scared," he "would soon be out to help them;" and he said, in substance, that, if it had not been for Forsyth, he would not have been put in jail. The court charges you, gen-

tlemen, that all of this evidence, if credible by you, is competent and material to the issue as tending to show a motive on the part of the prisoner, Hall. It is for the jury to say whether or not it is credible, and it is for them to say whether it is sufficient corroboration of the testimony of Burch to justify them in exercising their power to credit it. Evidence which tends to show a motive in Hall of strong animosity against Forsyth, because of his connection with these rules, or either of them, in the United States court, is directly material to your inquiry. You also remember what Hall wrote Norman & Clarke: "Stuckey has lied about me, and has betrayed confidence. I wish somebody would run him out of the country.". Stuckey had testified on the trial of the first rule. You may, perhaps, gather from Hall's letter to him, encouraging him to take possession of some 89 of the Dodge lots, the nature of the confidence. Of course, gentlemen, it is proper for you to bear in mind all that Hall said on this subject in his testimony. He denied utterly the statement to Burch and the letter from the jail to Burch. In his letter to Freeman he said he alluded simply to his professional services. He denied the statement to Avant. By the humanity of the federal law he is permitted to testify in his own behalf, and it is for the jury to attach such weight to his testimony as they think they can safely and properly give to it. There is other evidence upon which the government relics as tending to show the animosity of Hall towards the Dodges and their agents. In a public address made at Eastman, according to the testimony of Hamilton Clarke, he said to the people that when the Dodges "came on their lands they should meet them with shotguns, and leave their carcasses for the buzzards to pick, or cram them down gopher holes." According to the testimony of McCrimmon, he said, in a similar speech at Milan, that the "Dodges should be sent hellward." According to the statement of Issadore McCormick, he said at Chauncey that he was a martyr, and had been persecuted beyond all reason by this great landed monopoly. According to the testimony of Strum, Hall told the witness, who was complaining that one of the Dodges' agents was acting "biggity:" "The nights are dark. You have your guns. The matter is in your own hands,"—or words to that effect. After the killing of Forsyth, according to the testimony of Bright, while complaining of his persecution and imprisonment by the Dodges, he said: "Now I have them on the hip." According to the testimony of the Honorable D. M. ROBERTS, judge of the superior court, shortly after the death of Forsyth the witness was talking with Hall on the streets of Eastman, when two persons came up, and one of them said: "Perhaps the Dodges had better send some more of their d—d agents down here." The other one said: "We have got some more shotguns and buckshot;" and Hall replied, according to the testimony of Judge ROBERTS: "They had better send along some steel houses for them to live in." Now, gentlemen, this testimony, if true, is likewise material and important in this investigation. Hall complained, if the witnesses are to be believed, because of his imprisonment and alleged persecution. It does not appear that he was imprisoned otherwise or elsewhere than by the United

States court. He showed very strong resentment towards the Dodges in his public declarations, if the testimony is true. It has been urged that to hold him responsible because of these utterances would be to deny him that free speech which is the heritage of a freeman. It is perhaps not necessary for the court to remind the jury that the liberty of free speech is not a license to the encouragement, public or private, of crimes of violence; and the constitution of the state of Georgia itself, while guarantying liberty of speech, declares that any person may speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty. It is proper, however, that the court should again direct your attention to Hall's testimony on this subject. You will remember how he qualifies, or attempts to qualify, the testimony of Judge ROBERTS. While he admits he advised the people to meet force with force, he denies any encouragement to commit crime in his public speeches. If, however, you credit the witnesses who impute these utterances to him, you may well regard that testimony as material and competent in the corroboration of Burch, because a bitter and truculent feeling towards the Dodges, which would induce Hall to encourage his hearers to commit crimes of violence upon the Dodges or their agents, would be an important element tending to show the motive, and, therefore, the guilt, of the conspiracy to murder one of those agents; and if this was done because he had been imprisoned under a rule sued out by Norman W. Dodge in the United States court, or because of such rules then pending, it would be the more material, tending to show a motive for the precise conspiracy charged in this bill of indictment.

With reference to the testimony of Burch, detailing the circumstances under which he got $100, as he testifies, from Hall on the 23d of October, with which to pay the murderer Herring, the government relies upon several circumstances of corroboration. They offer evidence to show that Burch and Cadwell had gone to Hawkinsville in an anxious effort to get the money. Burch testifies that Herring had sent him word that if he didn't pay him the money he would kill him. Failing in Hawkinsville, Burch says they came back to Eastman, and reached there before day; that he went out to Hall's, knocked on the door with his knife; that Hall called from the upper window, and asked him who it was. Burch said it was "L. B.," and Hall came down with a lamp in his hand, and admitted him. They went into the sitting-room, and Hall sat down, holding the lamp in his hand while he sat there. Burch stated what he came for, and Hall went up-stairs, and brought the money down, but claimed that Burch and his party had not done enough; they had not burned the trestles, and driven the Dodges out of the country. The testimony of Cadwell is that he came there with Burch that morning. That they went to Sam Rogers', who kept a store and boarding house; went up-stairs, and made a fire. It was before day. That Burch came with him from Hawkinsville. That they had not been there long before the witness missed Burch. He was gone about two hours, or rather the witness did not see him for about two hours. L. M. Peacock testified that he resided at Eastman, and saw Cadwell and

Burch on the 23d of October. They tried to borrow $100 from him, Cadwell did, and said he wanted it for a friend who was in town. He said that Burch lived 18 miles to the south of Eastman, or rather south, and Cadwell south-east. Sam Rogers testified that Andy Cadwell came to his house the same morning. He went up-stairs, and made a fire; that there was a person with Cadwell who he was very well satisfied was Burch; that some of them came down the stairs and went away, and were gone about a half an hour, or not quite so long. He said it was a half a mile from his house to Hall's place. Now, gentlemen, if the testimony of Cadwell and Rogers be true, it is material and important, as tending to corroborate Burch. These parties were in Hawkinsville the day before. They reached Eastman on the train before day. It was necessary to build them a fire at some inconvenience. What motive, then, would Burch have had, before day, to disappear from the fireside, and be gone for a period as long as that? He says he went to Hall's. Cadwell says he missed him. You will also consider, gentlemen, the intrinsic merit of Burch's statement. He tells you he knocked on Hall's door with his knife after the question is asked him. He says that Hall sat with the lamp in his hand during the interview. These may be trifling circumstances, without importance, but the jury, having their attention called to them, may possibly deem them of that natural character which will negative the idea that the story was concocted. On this subject it is proper to call your attention to the denial of Hall, and to the statement of Hall's daughters and a servant, that his room was down-stairs, and that he always slept down-stairs. If this be true, it may discredit Burch. The jury, however, ought to consider all the circumstances which might surround a man in Hall's situation. He was known to be hostile to the Dodges. Their agent, Forsyth, had been shot dead through his window in a lower room of his house 16 days previously. Fifteen days previously Renew had been killed by the friends of Capt. Forsyth. The jury will inquire whether Hall could have had any apprehension which would cause him to sleep up-stairs. If the testimony of Warren which related to that day is entitled to any credit, there were those who were accusing Hall of participation in the death of Forsyth, and the jury will inquire whether there is any motive which would prompt Hall to stay upstairs instead of in his usual room during that period of excitement. At this point the court will call your attention to the testimony of D. T. Warren, who tells you that he met Burch that day. He had not seen him for two years. After some conversation, Burch said to him: "What is the news?" and Warren replied: "The news is that they are putting the killing of Forsyth on you and Hall and Knight." His words were: "They have got you and Hall and Knight spotted with the killing of Forsyth. It seems to me that Col. Hall has had trouble enough;" and Burch replied that Col. Hall had nothing to do with it, and knew nothing about it; and, pointing to the breech of a gun that was in his buggy, said: "There is the gun that did the work." Great stress is laid upon the testimony of this witness by the defense. The prosecution replies that it is not likely that Burch would

have made, in such a reckless manner, a confession of deadly crime to a man whom he had not seen for two years. They call attention to the fact, too, that Burch came there from Hawkinsville, which is on this side of Eastman, and came on the train, and that he did not come in a buggy. You will remember the testimony of Cadwell and Peacock on that subject. If Burch's buggy was in Eastman, how could it get there? These are matters for the jury. If they believe from the evidence that Burch's buggy was not in Eastman, they should discard the testimony of Warren altogether. That, however, is entirely for the jury. If the jury believe from all this evidence that the testimony of Burch is sufficiently corroborated, or is otherwise entitled to their credit, they are authorized to act upon it. If, however, they do not believe the testimony of Burch, they should discard it, and the prosecution must fail. The circumstances of corroboration relied on to corroborate Burch with reference to Wright Lancaster are that he had moved his brother-in-law, Moore, on the Bullard land, which comprised some of the Dodge lots; that this was a violation of the injunction; that he had deeded one of the Dodge lots to Burch, in violation of the injunction, and that Burch had leased him some of the Dodge lots. Burch testified that Wright Lancaster sent Clemens to him; that he knew nothing about Clemens or Lowry. It appears from the evidence that Clemens lived in a different part of the county from Burch; that Lowry or Herring had been a witness for Clemens in his trial for highway robbery in Coffee county; that John Lancaster brought Clemens to Burch's house; that Clemens slept at Lancaster's the night before. John Lancaster admits carrying Clemens to Burch's house, but explains that he did it merely to carry Burch's buggy back, which he had borrowed. John Lancaster tells you he could never get along with Burch. It seems, however, that he had borrowed his buggy. He tells you that he knew nothing about the coincidence of Lowry's reaching Burch's at the same time Clemens reached there. It is true that Wright Lancaster was on Clemens' bond for robbery, and as his surety, and also as the sheriff of the county, could have arrested Clemens, if it be true that he was a fugitive from justice. Burch said Wright Lancaster said he would send Clemens to his house, and John Lancaster did actually carry him there. The theory of the prosecution is that Wright Lancaster had such a hold on Clemens, and, through him, on Lowry, that he could control Clemens, and induce Lowry to commit the murder for pay. It is in proof by Wyly Burch that, shortly before the murder of Forsyth, that Wright Lancaster came to the house, stayed all night, and slept with Clemens. Bohannon testified that after Burch's sickness and excitement Wright Lancaster went up to see him, and when he came back said that "Burch was acting the fool." The flight of Henry Lancaster is a fact which tends to corroborate Burch's statement that he sent the money to the negro by Henry Lancaster. Bohannon's testimony to the several conferences between Burch and the Lancasters at the mill is of a similar character. Lowry's flight, the testimony of Louis McDaniel, of the two colored men, John Williams and Calvin Fleming, of Montgomery county, the absence

of Lowry from his home in Montgomery county for a month, coincident with the time he remained at Burch's, his return home, his new clothes, his gold watch, his $200 in money, his conduct in Jessup when he learned that Clemens, Hall, Burch, and the others were arrested, his conduct when he returned to Montgomery county, his statement that they had caught Clemens, and would be after him next, and his subsequent disappearance, all strongly tend to show his guilt, and to corroborate the testimony of Burch in that respect. You will, also, gentlemen, consider the letter to Hill & Harris, and the conversation with Bishop & Chaney, on the part of Hall, in connection with the statement of Bright that he "had the Dodges on the hip" now, and see if the construction which the prosecution attempts to place upon that evidence is justifiable. You will bear in mind the explanation of it that Hall has given. If you believe that Hall was using the murder of Forsyth as a means of forcing or intimidating the Dodges to abandon the proceedings against him, this evidence becomes very material indeed, as tending to support the theory of the prosecution. Of course, if it was a mere appeal for discontinuance of these rules, it would have no such significance. In this connection you should bear in mind that Hall is a lawyer of considerable experience, and you should also consider whether the incidents shortly preceding his application to these gentlemen, the death of Forsyth, and his own public declarations, would render it reasonable that he should be appealing to the Dodges or their attorneys for an amicable settlement or abandonment of the proceedings against him.

The circumstances of corroboration that the government relies on to connect Louis Knight with the conspiracy, to the testimony of Burch, are the proof offered to show his criminal intimacy with Hall in the forgery of deeds, the fact that he had litigation with the Dodges, which he had lost, and the testimony of Curry to the effect that he had charged Forsyth with forgery and perjury. Hall himself testifies that Forsyth told him that Louis Knight was making forged deeds. As a consequence of this, (to state the substance of his testimony,) he sent the copy deeds in evidence to Louis Knight, so that forgeries could be made, so that he might detect other forgeries by comparison before the jury, passing on an issue of forgery. It is in evidence, also, that in one of the envelopes he sent to Louis Knight there was a quantity of paper to be used for this purpose. The letters were mailed about the 22d or 23d of November, and they contained a request for the immediate return of the forged deeds. Hall testifies that he had no court in which he practiced, which met at that time, in which he could possibly use these deeds; and the jury can inquire into the reason for his haste in having them returned, to estimate the credit to be given to the statement as to the use he proposed for these deeds. This evidence is only admissible, however, to show the intimacy between Hall and Knight, which is always proper in a case of conspiracy, and, being proper, it is material to corroborate the testimony of Burch, to show their joint action.

I believe, gentlemen, that I have called your attention to everything I deem material which it is insisted corroborates the testimony of Burch.

Charles Clemens is jointly indicted with the other alleged conspirators, and his position before you is in no sense different, so far as this indictment is concerned. The testimony of Burch is admissible against Clemens, and, if you believe that it is otherwise credible, under the rules I have given you, he might well be convicted on that testimony. He has likewise confessed his guilt. If you believe from the evidence that his confession was voluntary, and admits the crime with which he is charged, and is corroborated as to all the material evidence of that crime, you would be justified in convicting him on the confession so corroborated. He is a person of full age and sound mind, and it is no excuse to him for the commission of crime that he was coerced or persuaded into its commission. Before, however, you can convict Clemens of any crime under this indictment, you must find that he is guilty of the conspiracy as charged in the indictment. You cannot convict him because he may be guilty of murder, for the crime of murder generally this court has no jurisdiction to try or to punish. You will therefore be obliged to acquit Clemens altogether, unless you find that he committed the murder in pursuance of the precise conspiracy charged in this bill of indictment. To determine whether he understood the conspiracy to exist, if you believe from the other evidence in the case that it did exist, you may look to his confession, and, if it shows that he entered the conspiracy after it was formed, he is quite as guilty as one of the original conspirators, if such they be. But I repeat that, if you do not find the conspiracy existed as charged, and for the purpose charged, you will have to acquit Clemens with the others, unless you should also find that the identical conspiracy existed between himself and others who are not on trial. But the conspiracy must be proven as charged.

At this point, I will give you, gentlemen, a request to charge, presented by the counsel for the prisoners, with a trifling modification.

"It is not within the power of the United States to punish for a conspiracy to murder within the state, unless the murder was committed in violation of some one of the United States statutes. *U. S.* v. *Cruikshank,* 92 U. S. 553. In this case the question of the power of the United States to inquire and punish for the alleged murder of Forsyth depends upon whether the killing was done in pursuance of a conspiracy to intimidate, threaten, or injure Norman W. Dodge, as alleged in the indictment."

Again:

"It needs something more than a proof of mere passive cognizance of fraudulent or illegal action of others to sustain conspiracy. If, therefore, you should find that there was, from the evidence in this case, a conspiracy, as charged in this indictment, then, in order to convict any person with the conspiracy so as to make such person liable under the indictment, you must find that such person did something more than entertain a mere passive cognizance of such conspiracy. You must find that such person did some act or made some agreement showing an intention to participate in some way in such conspiracy."

With reference to proof of intimacy between the alleged conspirators, you should bear in mind the proof that Hall himself testifies that he

had represented Burch in two cases, and that Burch had brought him money while he was in jail. You should bear in mind, gentlemen, all that the defendants have said in their own behalf. They have all been sworn, and they have all denied all incriminatory features of the evidence for the prosecution. Of course, if you believe them, you should acquit them. With the exception of Hall and Clemens, they have all offered proof of general good character. Good character is a fact, fit, like all other facts proven in the cause, to be weighed and estimated by the jury. Good character of a prisoner may render that doubtful which would otherwise be clear. If the guilt of the accused is proven to the satisfaction of the jury, however, notwithstanding the good character of the accused has been given its due weight by them, it would be their duty to convict the defendants, irrespective of such proof of character; for men who have borne a good character, it is the common experience, may and do commit crimes. In determining whether or not all the prisoners who have put their characters in issue are shown to possess good characters, the jury must consider all the evidence upon that subject. Several witnesses were introduced by the prosecution to show that Louis Knight was a man of bad character, and one witness, I believe, was introduced to show that Wright and John Lancaster had bad characters. The jury will bear in mind all that was said on that subject for and against the character of these prisoners, and make such estimate as they think proper, in view of the evidence. Evidence of character is not evidence, as a general rule, of the highest and most important character in legal investigations. The government cannot put the prisoner's character in issue unless the defense thinks proper to do so. It is true, moreover, that because a prisoner may not choose to put his character in issue, he is not to be prejudiced in the minds of the jury thereby. Evidence has been offered, also, both to attack and sustain the general character for truth and veracity of the witness Burch. A witness impeached by proof of general bad character for truth and veracity may be sustained by proof of general good character for truth and veracity. That is a question entirely for the jury. Even though a witness may be impeached, the jury may credit him, if they are satisfied that he has told the truth in the particular case at bar. At this point the court will read to the jury sections 4320–4323 of the Code of Georgia, which read as follows:

"Murder is the unlawful killing of a human being, in the peace of the state, by a person of sound memory and discretion, with malice aforethought, either express or implied." "Express malice is that deliberate intention unlawfully to take away the life of a fellow-creature, which is manifested by external circumstances capable of proof." "Malice shall be implied where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart." "The punishment for persons convicted of murder shall be death, but may be confinement in the penitentiary for life, in the following cases: If the jury trying the case shall so recommend, or if the conviction is founded solely on circumstantial testimony, the presiding judge may sentence to confinement in the penitentiary for life. In the former case, it is not discretionary with the judge. In the latter, it is."

A word of instruction, now, as to the form of your verdict, and I have done. This indictment, as we have seen, is framed under two sections of the Revised Statutes. There are conspiracy counts framed under section 5508, Rev. St., for which the statute provides its own punishment, viz., "not exceeding ten years imprisonment," etc. There are also counts for a substantive and additional felony, framed under section 5509, Rev. St., which provides that if a felony is committed in the progress of such a conspiracy, the parties convicted shall receive their individual punishment, according to the punishment fixed for such felony under the laws of the state. The substantive offense is murder. The jury may, therefore, as they may believe is proper from the evidence, convict all or some of these defendants both on the conspiracy counts and the felony counts; or they may convict all or some of these defendants on the conspiracy counts only, or they may acquit all, or acquit some, and convict the others. A verdict of guilty generally would mean guilty on the conspiracy counts and on the murder counts; the substantive felony being that of accessory before the fact to murder. The punishment on a general verdict of guilty will be death, unless the jury recommend the defendants so found guilty to the mercy of the court, in which case it will be imprisonment for life. If you find all the defendants guilty both on the conspiracy and felony counts, the form of your verdict will be: "We, the jury, find the defendants [naming them] guilty, as charged;" recommending that they be imprisoned for life or not, as you may believe is proper from the evidence. If you find some of the defendants guilty both on the conspiracy and felony counts, and others of the defendants guilty of the conspiracy counts only, the form of your verdict will be: "We, the jury, find the defendants [naming them] guilty, as charged, and we find the defendants [naming them] guilty on the conspiracy counts only," as you may believe is your duty, in view of the evidence. You may find some of the defendants guilty generally, some guilty on the conspiracy counts only, and other not guilty, as you may be impressed; or you may find all of the defendants not guilty.

Gentlemen of the jury, this has been a case of unusual importance, —an investigation of momentous interest,—and it is not surprising, in view of the anxiety and zeal of the advocates, that topics have been presented to your minds which have no pertinence to the issue on trial, and no appropriateness in the range of mental vision of upright, law-respecting, and oath-respecting jurors. Such incidents are so usual in criminal trials that the mind ceases to be startled at their presentation, and yet they are gravely injurious to the cause of justice. I allude to open and palpable appeals to the sympathy and commiseration of the jury, to pathetic allusions to afflicted families, to misleading references to the conduct of parties whose character and conduct is in no sense involved in the issue on trial, and, in short, to all of those *ad captandum* observations, which drop the poison of prejudice into the mind of an unsuspecting juror, and thus palsy and paralyze his best and most honorable efforts in the direction of a stern and inflexible performance of duty. Perhaps nothing is more dangerous in this direction than obser-

vations which tend to create a false impression upon the mind of the jury that it has become their duty—a point of precedence with them—to disregard the assistance which the court, with the best, the most anxious, and, the most earnest desire to aid them to arrive at a just conclusion, has tendered in its instructions. We have much larger latitude in that respect under the federal system than obtains in the courts of the state. We can sum up the evidence, as I have attempted to do in this case. We may, in strong terms, express opinions on the evidence, as I have carefully refrained from doing in this case. We must, however, in any case, in either event, leave the facts to the free finding of the jury, as I have already done, and again do in this case. It is all done, however, to aid the jury, and not to lead them. Permit me to say that it has been the purpose of the court in this laborious trial to give to this evidence a searching scrutiny, which the magnitude of the accusation demanded. In that task the court has witnessed with pleasure and satisfaction the attention, the patience, the impartiality, and the scrupulous regard to duty which has appeared to signalize the action of the jury. The counsel from their respective and opposing positions of advocacy have left nothing undone or unsaid which could influence your verdict, or enable you to see their respective causes in the fullest and clearest light. The court has reviewed the entire case in its instruction, as best it could, and the issue is now finally committed to you. The vast record is consigned to your fair, patriotic, and intelligent arbitrament, and may that Omnipotence whose bright attributes are justice and truth now guide your hearts and minds to their righteous ascertainment.

### VERDICT OF THE JURY.

Whereupon, to try the issue joined, a jury being called, the jurors of the jury whereof mention is above made likewise come, who, being called, elected, tried, and sworn the truth to speak in this behalf, and a true verdict render, according to the evidence, upon their oaths say:

"We, the jury, find the defendants Charles Clemens, L. A. Hall, and Wright Lancaster guilty, as charged, and recommend them to the mercy of the court, imprisonment for life; and we find the defendants John K. Lancaster and Louis Knight guilty on the conspiracy counts only; and we find the defendant James Moore not guilty. L. P. ASKEW, Foreman."